919 F.2d 857
 ROE, Jane, Moe, Mary, National Abortion Rights Action League
of Pennsylvania, Planned Parenthood of Southeastern
Pennsylvania, Elizabeth Blackwell Health Center for Women,
Reproductive Health and Counseling Center, Women's Suburban
Clinic, Allentown Women's Center, Northeast Women's Center,
Women's Medical Services, Kline, Dr. Allen
v.
OPERATION RESCUE, Terry, Randall, Lisant, Reverend James P.,
Pro Life Nonviolent Action Project of Bronx, N.Y., Herlihy,
Thomas, Pro-Life Nonviolent Action Project of Philadelphia,
McMonagle, Michael, Chester County Citizens Concerned About
Life, O'Brien, John J., Council for the Sanctity of Human
Life, Foreman, Joseph, Advocates for Life, Burnett, Andrew,
American Life League, Brown, Judie, Direct Action Committee,
Hoffer, Kathy, Hoffer, Craig, Life and Family Center,
Schulberg, Andrew, Pro Life Action League, Scheidler,
Joseph, Pro Life Direct Action League, Ryan, John, Omaha
Christian Action Council, Hartford, Denny, Pro Life
Nonviolent Action Project of Washington, D.C., O'Keefe, John
Cavanaugh, Smith(s), John and Smith(s) Jane, the Last Two
Being Fictitious Names, the Real Names of Said Defendants
Being Presently Unknown to Plaintiffs, Said Fictitious Names
Being Intended to Designate Organizations or Persons Who are
Members of Defendant Organizations, and Others Acting in
Concert with Any of the Defendants Who are Engaging in, or
Intend to Engage in, the Conduct Complained of Herein,
Randall Terry, Michael McMonagle, Joseph Foreman, Tina Krail
and Operation Rescue, Appellants in No. 89-1011,
Joseph Foreman, Randall Terry, Operation Rescue, Michael
McMonagle and Tina Krail, Appellants in No. 89-1428,
National Abortion Rights Action League of Pennsylvania,
Planned Parenthood of Southeastern Pennsylvania; Elizabeth
Blackwell Health Center for Women, Reproductive Health and
Counseling Center, Women's Suburban Clinic, Allentown
Women's Center, Northeast Women's Center, and Cherry Hill
Women's Center, Appellants in No. 89-1471.
 Nos. 89-1011, 89-1428 and 89-1471.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 19, 1990.
Decided Nov. 26, 1990.
 
 J. Michael Considine, Jr. (argued), The Rutherford Institute of Pennsylvania, West Chester, Pa., for appellants/cross appellees Joseph Foreman, Operation Rescue and Council for Sanctity of Human Life.
 William A. Bonner (argued), The Rutherford Institute of Pennsylvania, Media, Pa., for appellants/cross appellees Randall Terry and Operation Rescue.
 Joseph F. Wusinich, III (argued), Wusinich & Brogan, West Chester, Pa., for appellant/cross appellee Michael J. McMonagle.
 Francis J. Manion, Mt. Holly, N.J., for appellant/cross appellee Tina Krail.
 Mark L. Tunnell, West Chester, Pa., for appellants/cross appellees Randall Terry and Operation Rescue.
 Nancy J. Bregstein (argued), Mary A. McLaughlin, Debra L. Subar, Lori Lowenthal Stern, Dechert, Price & Rhoads, Philadelphia, Pa., for appellees/cross appellants Northeast Women's Center, Women's Suburban Clinic and Elizabeth Blackwell Health Center for Women.
 Susan Cary Nicholas, Linda J. Wharton, Women's Law Project, Philadelphia, Pa., for appellees/cross appellants Nat. Abortion Rights Action League of Pa., Planned Parenthood of Southeastern Pennsylvania, Elizabeth Blackwell Health Center for Women, Reproductive Health and Counseling Center, Women's Suburban Clinic, Allentown Women's Center, Northeast Women's Center, Women's Medical Services and Dr. Allen Kline.
 Before HIGGINBOTHAM, Chief Judge, BECKER and NYGAARD, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This is an appeal by defendant Operation Rescue, a group of organizations and individuals whose purpose, the district court found, is to "organize and coordinate disruptions of abortion and family planning facilities," and by a number of individual defendants associated with Operation Rescue. These defendants appeal from the district court's grant of a permanent injunction preventing them from demonstrating in front of and disrupting activities at various women's health facilities in the Philadelphia area. They also appeal from the district court's order holding them and a number of other anti-abortion protesters in civil contempt for violating a temporary restraining order and requiring them to pay compensatory damages to those plaintiff-clinics that were subjected to unlawful protests. In addition, plaintiffs have filed a cross-appeal in which they challenge the district court's dismissal of certain plaintiffs for lack of standing and the court's holding that it is powerless to award compensatory damages to non-party clinics.
 
 
 2
 The parties have briefed a considerable number of issues, including: (1) whether the dismissed plaintiffs have standing; (2) whether the plaintiffs have met the requirements of 42 U.S.C. Sec. 1985(3) by establishing--(a) sufficient class-based animus, (b) violation of their constitutional rights to abortion and/or travel, and (c) sufficient government involvement to establish an infringement of the abortion right; and (3) whether a non-party (one of the clinics) is entitled to civil contempt damages. The standing and contempt questions, although requiring some discussion, are relatively straightforward. We have little difficulty concluding that the dismissed plaintiffs have standing to sue and that the district court correctly found itself unable to award contempt damages to a non-party--i.e., Cherry Hill Women's Center. By contrast, the Sec. 1985(3) issues are considerably more complex.
 
 
 3
 We need not grapple with these federal issues here, however, because we are satisfied that the injunction must be affirmed on state-law grounds of trespass and intentional interference with contractual relations, regardless of our ultimate resolution of the Sec. 1985(3) questions. When the district court granted the injunction, it specifically stated that each of plaintiffs' three causes of action--their Sec. 1985(3) claim and their two state-law claims--was by itself sufficient to warrant injunctive relief. Defendants have not appealed the court's grant of summary judgment on plaintiffs' two state-law claims. Considering the complexity of the federal issue and the unchallenged bases for upholding the permanent injunction, we decline to issue an ambitious advisory opinion, and we will therefore affirm the order granting the injunction.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 4
 In the early summer of 1988, Operation Rescue publicly announced plans to close down clinics that offer abortions in the Philadelphia area by staging massive demonstrations and blockades at these facilities during the week of July 4. These demonstrations, described below, constituted one phase of a well-orchestrated campaign to disrupt and shut down abortion clinics throughout the nation. Operation Rescue's plans for Philadelphia involved a rally on July 4 and "rescue missions"--i.e., blockades and demonstrations--at abortion clinics on July 5 and 6. The organization, however, did not identify in advance which Philadelphia area clinics it intended to target.
 
 
 5
 The success of Operation Rescue's blockades elsewhere, particularly in New York City, and its public boasts about the prospective Philadelphia demonstrations led eleven plaintiffs to file a complaint in the district court for the Eastern District of Pennsylvania on June 29, 1988, seeking declaratory and injunctive relief against the threatened protests, as well as money damages.[1] The original eleven plaintiffs consisted of seven abortion and family planning clinics;[2] the National Abortion Rights Action League of Pennsylvania ("NARAL/PA"), the local chapter of a national organization representing people who wish to keep abortion legal; Jane Roe and Mary Moe, two pregnant women for whom abortions had been scheduled during the week of July 4; and Dr. Allen Kline, a physician who regularly performs abortions in Philadelphia.[3] The thirty named defendants included Operation Rescue; Randall Terry, the National Director and Organizer of Operation Rescue; Joseph Foreman, the Regional Director of Operation Rescue; and Michael McMonagle, the Executive Director of Pro-Life Coalition of Southeastern Pennsylvania.[4]
 
 
 6
 Plaintiffs' complaint alleged two federal causes of action, one under the federal civil rights statute prohibiting conspiracies to deprive others of their constitutional rights, 42 U.S.C. Sec. 1985(3), and the other under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sec. 1962(c). The complaint also set forth four pendent, state-law claims: (1) tortious interference with existing and prospective contractual relations; (2) trespass; (3) intentional infliction of emotional distress; and (4) false imprisonment. Along with the complaint, plaintiffs filed a motion for a temporary restraining order ("TRO") and for a preliminary injunction to ensure that defendants' planned activities for the week of July 4 did not interfere with their rights to obtain and provide abortions.
 
 
 7
 After a hearing on June 30, 1988, the district court issued a TRO, enjoining the defendants and others acting in concert with them from trespassing on, blocking entrances at, or physically abusing or harassing persons working or obtaining services at abortion facilities in the metropolitan Philadelphia area from July 4 to 9. The court stated:
 
 
 8
 The explicit purpose of [defendants'] protests, as stated in the promotional literature regarding the event and as demonstrated in recent protests by defendants, is to block access to clinics or doctors' offices where abortions are performed. There is a strong likelihood that plaintiffs, including women scheduled for abortion procedures at various clinics in Philadelphia during the week of July 4, 1988, will suffer both physical and emotional harm if they cannot gain access to the various abortion facilities in this City for their scheduled appointments.
 
 
 9
 Five days later, on July 5, the court modified its TRO to include Cherry Hill, New Jersey as part of the protected area. A hearing on plaintiffs' request for a preliminary injunction was scheduled for July 11 and ultimately was continued until September 13.
 
 
 10
 In spite of the TRO, defendants carried out their planned "rescue missions." Acting with extensive support, they demonstrated and blocked access to entrances at WSC on July 5, NEWC on July 6, and CHWC on July 9. In the course of these demonstrations, police arrested over 900 people. Defendants' protests succeeded in obstructing the operation of these three clinics. In particular, WSC, NEWC, and CHWC suffered significant scheduling disruptions and financial loss.
 
 
 11
 In the wake of these events, plaintiffs, on July 28, 1988, moved for an order adjudging certain defendants in civil contempt. The affidavits accompanying this motion described in detail how the defendants, after acquiring actual knowledge of the TRO, violated its provisions on three separate occasions between July 5 and 9. The plaintiffs also renewed their motion for a preliminary injunction. These motions were scheduled for argument on September 13, 1988, together with a hearing on plaintiffs' request for a permanent injunction. On that date, the parties agreed to a temporary consent decree that provided for a preliminary injunction to remain in effect until the hearing on the permanent injunction. An order was entered by the court in accordance with this consent decree on September 22, 1988, and the hearing on plaintiffs' motions for a permanent injunction and to hold defendants in civil contempt was continued until November 15, 1988.
 
 
 12
 On November 9, 1988, prior to the hearing on civil contempt and permanent injunctive relief, the district court denied McMonagle's motion in limine to permit him to produce "medical and scientific evidence as to the humanity of the unborn child." Roe v. Operation Rescue, 123 F.R.D. 508, 510 (E.D.Pa.1988). McMonagle planned to show that he and other defendants reasonably believed that their actions were necessary to protect human life. He hoped to introduce such evidence as part of a justification defense to the contempt charge. The court, however, held that "defendants may not introduce evidence bearing on justification or motive for the acts allegedly committed." Id. at 511.
 
 
 13
 The district court heard two days of testimony in support of plaintiffs' motion for civil contempt. The plaintiffs presented evidence that certain named defendants were personally served with copies of the court's TRO and that other non-defendants were present while the TRO was read by federal marshals. The plaintiffs also presented witnesses from each of the three targeted clinics who testified concerning the details of Operation Rescue's blockades and the damages incurred by the clinics as a result. The court did not rule on plaintiffs' request for permanent injunctive relief at that time, however, for the parties mutually agreed to a continuation of the preliminary injunction then in effect. At the conclusion of the hearing, the court took the civil contempt matter under advisement, promising a prompt decision on plaintiffs' motion.
 
 
 14
 On December 5, 1988, the court held Operation Rescue, Randall Terry, Michael McMonagle, Joseph Foreman, and non-defendant Tina Krail in civil contempt for violating the TRO. The court imposed and then suspended conditional coercive fines on the contemnors in the amount of $5,000 for each past violation of the court's order and $5,000 for each future violation. Under the contempt order, any future violation by the contemnors would result in the immediate withdrawal of the suspension of these fines. The court also awarded plaintiffs attorneys' fees and compensatory damages, the latter amounting to $2,308.03--plaintiffs' payroll costs on the dates of defendants' demonstrations. Because CHWC was not a party to the action, however, the district court concluded that it was unable to award that clinic compensatory damages. The defendants and Krail filed an appeal (No. 89-1011) from the court's contempt order.
 
 
 15
 Several of the original plaintiffs subsequently were dismissed from the action. On December 5, the district court granted the motion for voluntary dismissal, pursuant to Fed.R.Civ.P. 41(a)(2), of plaintiffs Roe and Moe, the two pregnant women. Further, on December 19, the court dismissed for lack of standing certain other plaintiffs--including Dr. Kline, NARAL/PA, and the four clinics that were not subjected to blockades during the week of July 4. These plaintiffs, the court concluded, had failed to demonstrate that they had sustained or were in immediate danger of sustaining some injury as a result of defendants' putatively illegal conduct.
 
 
 16
 After the close of discovery, the parties filed cross-motions for summary judgment. On March 21, 1989, the district court granted summary judgment for plaintiffs on several of their claims and issued a permanent injunction against defendants' anti-abortion activities. See Roe v. Operation Rescue, 710 F.Supp. 577 (E.D.Pa.1989). This injunction rested on three alternative grounds: (1) plaintiffs' Sec. 1985(3) claim of conspiracy to violate their constitutional right to travel; (2) plaintiffs' state-law claim of trespass; and (3) plaintiffs' state-law claim of intentional interference with contractual relations. At the same time, the court granted summary judgment for the defendants on plaintiffs' Sec. 1985(3) claim of conspiracy to violate their constitutional right to abortion. The court also denied summary judgment to plaintiffs on their claim of false imprisonment and granted summary judgment for defendants on plaintiffs' claim of intentional infliction of emotional distress. Determining that plaintiffs were the prevailing parties, the district court awarded them attorneys' fees in the amount of $70,758.37 pursuant to 42 U.S.C. Sec. 1988. Content with the relief accorded to them, plaintiffs moved to dismiss their remaining claims. This motion was granted, and final judgment was entered on April 19, 1989. An appeal (No. 89-1428) and cross-appeal (No. 89-1471) followed and were consolidated with the earlier appeal from the district court's contempt order.
 
 
 17
 On appeal, defendants ask us to review the district court's orders: (1) issuing a permanent injunction predicated on plaintiffs' Sec. 1985(3) claim, and (2) holding McMonagle and Krail in contempt for violating the TRO. On cross-appeal, plaintiffs ask us to reverse: (1) the court's order dismissing certain plaintiffs for lack of standing, and (2) its refusal to award CHWC compensatory damages.
 
 II. STANDING
 
 18
 The district court dismissed several plaintiffs from the case for lack of standing. Of these plaintiffs, Dr. Kline and WMS do not appeal their dismissal. The other dismissed plaintiffs, three area abortion clinics (RHCC, Planned Parenthood, and AWC) and a state affiliate of a national abortion rights organization (NARAL/PA), however, challenge the district court's determination that they lack standing. Our review of this determination is plenary. See Starks v. Perloff Bros., 760 F.2d 52, 55 (3d Cir.1985).
 
 A. The Clinics
 
 19
 As we have noted, the district court dismissed for lack of standing the abortion clinics that were not blockaded by defendants during the week of July 4. Although these facilities were potential targets of defendants' activities during that week and remain potential targets for their future demonstrations, the court concluded that the clinics had not established a "real and immediate" threat of future injury. We disagree. Considering defendants' past and likely future conduct, we believe that RHCC, Planned Parenthood, and AWC (the dismissed plaintiffs) are as vulnerable to future harassment by defendants as are the clinics that were actually subjected to blockades during the week of July 4. We therefore think that these clinics should also be protected by the court's permanent injunction.
 
 
 20
 Article III of the Constitution requires a litigant to allege an actual case or controversy before invoking the jurisdiction of a federal court. In particular, "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged ... conduct and [that] the injury or threat of injury [is] both 'real and immediate,' not 'conjectural' or 'hypothetical.' " City of Los Angeles v. Lyons, 461 U.S. 95, 101-02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (citations omitted); see also Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) ("Art[icle] III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant'....") (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979)).
 
 
 21
 To establish a present case or controversy in an action for injunctive relief, a plaintiff must show that he or she is likely to suffer future injury from defendant's threatened illegal conduct. See Lyons, 461 U.S. at 105, 103 S.Ct. at 1666. The district court therefore properly focused on whether the threat to the clinics is "sufficiently 'real and immediate,' " id. at 103, 103 S.Ct. at 1665 (quoting O'Shea v. Littleton, 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)). After reviewing the record, however, we cannot agree with the court's conclusion that the threat of future harm to these clinics is insufficiently concrete to confer standing.
 
 
 22
 As we mentioned earlier, the dismissed clinics are all facilities that perform abortions in the Philadelphia area. In June of 1988, when this action began, these clinics faced the very real threat that they would be effectively shut down during the week of July 4 as a result of defendants' demonstrations. Media accounts of Operation Rescue's earlier activities in New York City reported that the defendants planned to launch similar "rescue missions" in Philadelphia during the week of July 4, 1988. Based on this information, the district court granted a TRO, including the now-dismissed clinics within its protective embrace.
 
 
 23
 Only three clinics were ultimately blockaded by defendants during the week of July 4. Although the intensity of defendants' campaign thereafter waned, the district court determined that Operation Rescue is likely to continue blockading clinics in the Philadelphia area and therefore granted a permanent injunction as to clinics previously blockaded. Apparently because RHCC, Planned Parenthood, and AWC were not blockaded on July 5, 6, or 9, the court thought that these clinics no longer require judicial protection. There is nothing in the record, however, that indicates that the dismissed clinics are at any less risk than are the clinics that were actually targeted by the defendants during the week of July 4. The dismissed clinics' inability to prove that Operation Rescue has specifically targeted them does not mean that they are not threatened by the defendants' harassment. Operation Rescue, as part of its modus operandi, refuses to disclose in advance the targets of its demonstrations. In a cognate case, the Second Circuit concluded that this veil of secrecy increases, rather than diminishes, the threat that Operation Rescue poses:
 
 
 24
 [D]efendants' tactics add to the threatened danger that the clinics will suffer a real and immediate injury, because Operation Rescue insists on keeping secret which clinics it has targeted. Absent a known and specific target, each of the plaintiff clinics cannot help but assume that it is the one slated for a disruption of its business activities. This insistence on secrecy coupled with Operation Rescue's ability to muster quickly hundreds of participants at a chosen sight necessarily broadens the scope of the threat Operation Rescue poses to all the plaintiff clinics.
 
 
 25
 New York State National Organization for Women v. Terry, 886 F.2d 1339, 1348 (2d Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990).
 
 
 26
 In sum, the evidence shows that defendants possess strong anti-abortion views and that part of their strategy to garner popular support for their views is to organize massive protests at abortion clinics in large metropolitan areas. Accordingly, the threat that defendants will cause future harm to facilities such as the dismissed clinics is both real and immediate. The immediacy of this threat is underscored by the fact that two of the dismissed clinics, RHCC and Planned Parenthood, were blockaded by defendants after the week of July 4. We therefore believe that the district court erred in dismissing RHCC, Planned Parenthood, and AWC for lack of standing. We will reverse on this point and remand to the district court with instructions to reinstate these three plaintiffs as parties and to extend to them the benefit of the injunction.
 
 B. NARAL/PA
 
 27
 NARAL/PA was also dismissed by the district court for lack of standing. Generally, parties claiming standing must demonstrate "a personal stake in the outcome of the controversy," Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) (emphasis added). Where a representative organization is involved, however, "personal stake" is not needed to invoke federal-court jurisdiction. "Even in the absence of injury to itself, [such] an association may have standing solely as the representative of its members." Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). This rule "recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." International Union, UAW v. Brock, 477 U.S. 274, 290, 106 S.Ct. 2523, 2533, 91 L.Ed.2d 228 (1986).
 
 
 28
 In plaintiffs' complaint, NARAL/PA alleges, among other things, that it is suing "on behalf of ... its members, who include women who will need to use abortion and family planning facilities in Southeastern Pennsylvania." An organization can avail itself of the doctrine of associational standing and sue on behalf of its members if " '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' " New York State Club Ass'n. v. City of New York, 487 U.S. 1, 9, 108 S.Ct. 2225, 2232, 101 L.Ed.2d 1 (1988) (quoting Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)).
 
 
 29
 The latter two requirements are easily met. First, NARAL/PA's interest in enjoining the defendants from blockading abortion clinics is certainly germane to its organizational purpose. NARAL/PA's stated mission is to protect women's right to safe and legal abortions. This interest is clearly imperilled by Operation Rescue's efforts to deny women access to facilities that provide abortions. Second, the causes of action alleged and the relief requested do not require the participation of individual members in the litigation. NARAL/PA seeks declaratory and injunctive relief that will benefit its members who wish to visit abortion clinics in the Philadelphia area. See Warth, 422 U.S. at 515, 95 S.Ct. at 2213 ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."). Moreover, on the basis of the submissions before it, the district court granted plaintiffs summary judgment on their actions for trespass and intentional interference with contractual relations. The court, without the need for participation by individual class members, concluded that defendants "interfered with the clinic-patient relationship with the purpose or intent of harming the plaintiff[s] by preventing the relationship from occurring." 710 F.Supp. at 585-86.
 
 
 30
 The remaining element of the test for associational standing, however, is more problematic. Under this element, "an association has standing to sue on behalf of its members when those members would have standing to bring the same suit." New York State Club Ass'n, 487 U.S. at 9, 108 S.Ct. at 2232. The purpose of this requirement "is simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation." Id. According standing to NARAL/PA does not contravene this purpose, for we think that NARAL/PA has alleged real injury to its members.
 
 
 31
 As the district court has already found, defendants' conduct threatens the rights of both abortion clinics and their patients. NARAL/PA seeks to represent a subset of the latter group--i.e., female members of NARAL/PA who in the future may require the services offered at Philadelphia area clinics. Accordingly, NARAL/PA must show that these members have suffered some actual or threatened harm as a result of Operation Rescue's putatively illegal conduct. See Valley Forge Christian College, 454 U.S. at 472, 102 S.Ct. at 758. As we mentioned above, NARAL/PA, in its complaint, alleges that its members include women who will need to use abortion and family planning facilities in the area targeted by defendants. This assertion, which was neither denied nor challenged below, is sufficient to establish that defendants' illegal demonstrations threaten to injure NARAL/PA's members by blocking their access to Philadelphia area clinics. We note further that since NARAL/PA has averred that some of its members will seek the general gynecological and family planning services offered by these facilities, it need not produce a member actually seeking an abortion.[5]
 
 
 32
 Because the three requirements of associational standing are met, we conclude that NARAL/PA has standing to sue on behalf of its members who will need to use the co-plaintiffs' facilities in the future.[6] Accord New York National Organization for Women, 886 F.2d at 1348. We therefore will reverse the district court's dismissal of NARAL/PA as a plaintiff.
 
 III. THE VALIDITY OF THE INJUNCTION
 
 33
 As we noted above, plaintiffs prevailed on two pendent state-law causes of action: trespass and intentional interference with contractual relations. Defendants do not argue on appeal that the district court's resolution of these state-law claims was erroneous. Therefore, the injunction, which rests independently on each of these grounds, must be upheld regardless of the merits of plaintiffs' Sec. 1985(3) claim.[7] See Northeast Women's Center, Inc. v. McMonagle, 868 F.2d 1342, 1355 (3d Cir.) (declining to decide whether injunctive relief is available to private parties under civil RICO because such relief was warranted by plaintiff's meritorious state-law claim), cert. denied, --- U.S. ----, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989); Northern Virginia Women's Medical Center v. Balch, 617 F.2d 1045, 1049 (4th Cir.1980) (sustaining injunction against anti-abortion demonstrators based on pendent state-law claims); Portland Feminist Women's Health Center v. Advocates for Life, Inc., 681 F.Supp. 688, 691-92 (D.Or.1988) (upholding preliminary injunction against anti-abortion demonstrators based on pendent state-law claims after Sec. 1985(3) claim was dismissed).
 
 
 34
 Defendants do, however, challenge the district court's jurisdiction to consider these state-law claims. In the jurisdictional section of their brief, defendants, almost in passing, suggest that the district court lacked subject matter jurisdiction over these claims because "all federal claims were, or should have been, dismissed." We disagree. Plaintiffs' "state and federal claims ... derive from a common nucleus of operative fact" and are "such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." United Mine Workers of America v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); see also Carnegie-Mellon University v. Cohill, 484 U.S. 343, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988). Accordingly, the district court had pendent jurisdiction over the state-law claims.
 
 
 35
 This is not a case, moreover, in which the federal claims were dismissed soon after the inception of litigation. In fact, plaintiffs' federal claims were not dismissed; they remained before the district court throughout the entire proceedings. Plaintiffs prevailed on their Sec. 1985(3) claim and voluntarily dismissed their RICO claim only after they had obtained all the relief they sought. Under such circumstances, the district court's exercise of pendent jurisdiction over the state-law claims was entirely proper. We therefore reject defendants' contentions to the contrary.
 
 
 36
 Although the defendants do not argue otherwise, it is useful to note here that the district court correctly determined that plaintiffs have satisfied the requirements for issuance of a permanent injunction.[8] As discussed above, plaintiffs succeeded on the merits of their trespass and intentional interference with contractual relations claims. The district court also made supported findings of fact and conclusions of law favoring the plaintiffs with respect to: (1) the availability vel non of an adequate legal remedy; (2) the reality of the threatened injury; (3) the existence of equitable defenses; and (4) the balance of the equities. The court, moreover, specifically considered defendants' first amendment rights in tailoring its injunction. In view of the district court's diligence and the defendants' failure to challenge any of these findings, the order granting a permanent injunction must be affirmed.
 
 IV. THE CONTEMPT ISSUES
 
 37
 After Operation Rescue's anti-abortion protests of July 5, 6, and 9, plaintiffs moved for an order holding certain defendants and other named individuals, including Krail, in civil contempt for violating the court's TRO. Prior to the contempt hearing, the district court announced that the proceedings would be civil in nature. Based on testimony presented during the hearing, the court found by clear and convincing evidence that a valid order of the court existed, that defendants and Krail had knowledge of the order, and that they nonetheless violated the order. The court proceeded to award compensatory damages to two of the three clinics that defendants unlawfully blockaded. The court did not award damages to CHWC because it was not a party to the action. Additionally, the court imposed a conditional coercive fine on defendants. By its terms, this coercive fine was not payable unless defendants violated the court's orders again.
 
 
 38
 A. Criminal or Civil Contempt?
 
 
 39
 Defendants claim that the district court's contempt sanctions were criminal, not civil, in nature and that the district court therefore did not follow necessary constitutional procedures. See Hicks v. Feiock, 485 U.S. 624, 632, 108 S.Ct. 1423, 1430, 99 L.Ed.2d 721 (1988) ("[C]riminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings...."). We disagree.
 
 
 40
 "The dichotomy between criminal and civil contempt lies in the function of the order." McDonald's Corp. v. Victory Investments, 727 F.2d 82, 86 (3d Cir.1984). The purpose of civil contempt is primarily remedial and to benefit the complainant. See Hicks, 485 U.S. at 631, 108 S.Ct. at 1429; Latrobe Steel Co. v. United Steelworkers of America, 545 F.2d 1336, 1343 (3d Cir.1976). Civil contempt sanctions are designed either to compensate the injured party or to coerce the defendant into complying with the court's order. See Gregory v. Depte, 896 F.2d 31, 34 (3d Cir.1990). Even when the sanctions coerce, they are designed to aid the complainant through ensuring that the contemnor adheres to the court's order. Latrobe Steel Co., 545 F.2d at 1344. Further, civil contempt proceedings are usually instituted on the motion of the plaintiff, not the court. Id. at 1343-44.
 
 
 41
 In determining whether a contempt sanction is civil, it is generally useful to examine the form of the relief granted. When the relief provided is imprisonment, the contempt proceeding is civil "if 'the defendant stands committed unless and until he performs the affirmative act required by the court's order.' " Hicks, 485 U.S. at 632, 108 S.Ct. at 1429 (quoting Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 442, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911)). As a result, it is often said that the imprisoned civil contemnor " 'carries the keys of his prison in his own pocket.' " Gompers, 221 U.S. at 442, 31 S.Ct. at 498 (citation omitted). There are also two types of civil contempt fines. The first kind is payable to the complainant as compensation for damages caused by the contemnor's noncompliance. See Latrobe Steel Co., 545 F.2d at 1344. The second kind is payable to the court, but defendant can avoid paying the contempt "fine" by performing the act required by the court's order. Hicks, 485 U.S. at 632, 108 S.Ct. at 1429.
 
 
 42
 By contrast, the purpose of criminal contempt is punitive and to vindicate the authority of the court by punishing past acts of disobedience. See id. at 631, 108 S.Ct. at 1429; McDonald's Corp., 727 F.2d at 86. Although civil contempt proceedings are part of the underlying action, criminal contempt proceedings are "separate from the actions which spawned them." Latrobe Steel Co., 545 F.2d at 1343. If the contemnor is imprisoned for a definite period or if the fine is unconditionally payable to the court, the relief is punitive, not remedial, and the contempt proceeding is, by definition, criminal.
 
 
 43
 Based on the foregoing, it is clear that the district court's order adjudging defendants and Krail in contempt was civil in nature. First, the court awarded compensatory damages to WSC and NEWC--the two clinics that were blockaded by Operation Rescue and that are also parties to this action. On the days when these clinics were subject to Operation Rescue's protest, they could treat only a small fraction of their scheduled patients. The court thus ordered the contemnors to reimburse these clinics for their wasted payroll costs.[9] These awards are clearly remedial and designed to compensate complainants for losses incurred as a result of contemnors' violations. Second, the court imposed a conditional coercive fine on the contemnors.[10] The court made the contemnors' obligation to pay these fines contingent on a future violation of its orders. In so doing, the court obviously was trying to ensure that the contemnors would not disobey its orders again. By coercing future compliance, such a fine benefits the complainants and thus is civil in nature.[11] Finally, three additional factors indicate that the contempt proceeding was civil: (1) the district court denominated its contempt order as civil; (2) the plaintiffs, rather than the court, initiated the proceeding; and (3) the contempt proceeding was integrally linked to plaintiffs' underlying action for injunctive relief.[12]
 
 B. Exclusion of the Justification Defense
 
 44
 Prior to the contempt hearing, McMonagle filed a motion in limine, which, if granted, would have permitted him to introduce medical/scientific evidence regarding fetuses. McMonagle hoped to use this evidence as part of a justification defense to the contempt charge against him. The district court denied this motion, and McMonagle appeals.
 
 
 45
 We need not dwell on this issue, for McMonagle's proffered justification defense already has been rejected by this court in Northeast Women's Center, Inc. v. McMonagle, 868 F.2d 1342, 1350-52 (3d Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989). That case, like this one, involved an action by a women's health center against a group of anti-abortion protesters. The protesters in McMonagle argued on cross-appeal that the district court erred in excluding evidence relating to their claim of justification. In rejecting this claim, we surveyed both federal and Pennsylvania law pertaining to the defense of justification. We noted that under federal law, a defendant's good-faith motive is not a viable defense, see United States v. Malinowski, 472 F.2d 850, 856-57 (3d Cir.), cert. denied, 411 U.S. 970, 93 S.Ct. 2164, 36 L.Ed.2d 693 (1973); United States v. Romano, 849 F.2d 812, 816 n. 7 (3d Cir.1988). Accordingly, the protesters could not assert justification as a defense to plaintiff's civil RICO claim. McMonagle, 868 F.2d at 1351.
 
 
 46
 Similarly, we noted that, under Pennsylvania law, a defendant seeking to assert a justification defense must show:
 
 
 47
 "(1) that the actor was faced with clear and imminent harm ...; (2) that the actor could reasonably expect that [his/her] actions would be effective in avoiding this greater harm; (3) that there [was] no legal alternative [that would have been] effective in abating the harm; and (4) that the Legislature has not acted to preclude the defense by clear and deliberate choice regarding the values at issue."
 
 
 48
 Id. (quoting Commonwealth v. Capitolo, 508 Pa. 372, 378, 498 A.2d 806, 809 (1985)). In view of these requirements, we concluded that the justification defense was also unavailable to anti-abortion protesters under Pennsylvania law:
 
 
 49
 We emphasize in particular the numerous legal alternatives that Defendants had available to pursue their goal of persuading women not to have abortions. For example, they could continue to march, go door-to-door to proselytize their views, distribute literature, personally or through the mails, and contact residents by telephone, short of harassment.
 
 
 50
 McMonagle, 868 F.2d at 1352.
 
 
 51
 We are bound by the clear precedent of the prior McMonagle case. We find therefore that McMonagle's present claim of justification is not a defense to plaintiffs' federal and state claims and that evidence relating to it was properly excluded by the district court.
 
 
 52
 C. The Civil Contempt of McMonagle and Krail: Was the Evidence Sufficient?
 
 
 53
 McMonagle and non-defendant Krail both argue that there was insufficient evidence to hold them in contempt for violating the court's TRO.[13] Once again, we disagree. The record amply demonstrates that plaintiffs satisfied their burden of establishing McMonagle's and Krail's civil contempt by clear and convincing evidence. See Concerned Citizens of Bridesburg v. Philadelphia Water Dep't., 843 F.2d 679, 682 (3d Cir.), cert. denied, 488 U.S. 853, 109 S.Ct. 139, 102 L.Ed.2d 112 (1988).
 
 
 54
 As the district court correctly stated, to show civil contempt, a plaintiff must establish the following: "(1) that a valid court order existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order." McMonagle does not contest the validity of the TRO, his knowledge of it, or his presence at the demonstrations. He instead claims that by protesting, he was merely exercising his right to free speech and that, at all events, there was insufficient evidence to establish his alleged trespass. Both claims are unavailing.
 
 
 55
 To begin with, McMonagle's right to free speech does not immunize him from liability for engaging in proscribed conduct. Insofar as McMonagle asserts that the TRO was an unreasonable time, place and manner restriction on his speech, the validity of the order may not be collaterally challenged in a contempt proceeding for violating the order. United States v. Stine, 646 F.2d 839, 845 (3d Cir.1981). In fashioning its TRO, the district court specifically considered defendants' first amendment rights.[14] On appeal, we employ an abuse of discretion standard to review the details of a court's equitable order. See Evans v. Buchanan, 555 F.2d 373, 378 (3d Cir.) (in banc), cert. denied, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977). Nothing in the record indicates that the district court abused its discretion in balancing the legitimate and competing interests of plaintiffs and defendants.
 
 
 56
 Further, we do not think that actual trespass is a necessary precondition for holding McMonagle in civil contempt. The law does not permit the instigator of contemptuous conduct to absolve himself of contempt liability by leaving the physical performance of the forbidden conduct to others. As a result, those who have knowledge of a valid court order and abet others in violating it are subject to the court's contempt powers. Cf. Quinter v. Volkswagen of America, 676 F.2d 969, 972 (3d Cir.1982); Alemite Mfg. Corp. v. Staff, 42 F.2d 832, 833 (2d Cir.1930).
 
 
 57
 McMonagle was personally served with a copy of the TRO on June 30, 1988. According to the record, he nonetheless participated in the protests at WSC on July 5 and at NEWC on July 6. McMonagle was indeed identified as one of the leaders of these demonstrations. With respect to the July 5 protest, one witness testified that McMonagle, wearing an Operation Rescue armband, stood across from WSC where he conferred with other protesters and with various police officials. Testimony regarding the July 6 demonstration at NEWC indicated that McMonagle, wearing a headset and standing with two men wearing Operation Rescue armbands, gave instructions to protesters and spoke with police officials. The district court determined that the above facts, which are sufficient to adjudge McMonagle in civil contempt, were established by clear and convincing evidence. This finding is not clearly erroneous, and we therefore affirm the court's contempt order.
 
 
 58
 The conduct of Krail, although not as egregious as that of McMonagle, was nonetheless a violation of the TRO. Krail points out that she is not a party to the underlying lawsuit and was not named in the district court's TRO. She asserts, further, that there is insufficient evidence of her knowledge of the court's TRO and that the evidence of her alleged violation of the TRO is far too imprecise to justify her being held in contempt.
 
 
 59
 "A person who is not a party to a proceeding may be held in contempt if he or she has actual knowledge of a court's order and either abets the defendant or is legally identified with him." Quinter, 676 F.2d at 972. The evidence shows that Krail actively participated in the demonstrations at WSC on July 5, at NEWC on July 6, and at CHWC on July 9. Witnesses testified that Krail was one of the first protesters to arrive at these clinics and to blockade their doors. The record also indicates that United States Marshals repeatedly read the TRO at these demonstrations using amplification devices.[15] Based on this evidence, which is clearly supported by the record, the district court did not err in concluding that Krail had knowledge of the order and violated its provisions.
 
 D. The Cherry Hill Women's Center
 
 60
 As mentioned earlier, CHWC is a clinic that performs abortions in Cherry Hill, New Jersey. In its order of July 5, the district court stated that the "Metropolitan Area" covered by the TRO encompassed Cherry Hill. Notwithstanding this order, Operation Rescue staged a protest outside of CHWC on July 9. This protest prevented the clinic from serving the 51 patients scheduled on that day. In its civil contempt order, the district court found that Operation Rescue had violated the TRO and that CHWC, as a result, had incurred losses in the amount of $819.32. The court, however, did not award compensatory damages to CHWC because the clinic was not a party to the underlying action.
 
 
 61
 CHWC contends that the Supreme Court's decision in McComb v. Jacksonville Paper Co., 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949), mandates reversal. In particular, CHWC asserts that "McComb plainly illustrates that an express non-party beneficiary of a remedial order may obtain damages in a contempt proceeding." We believe that CHWC reads McComb too broadly.
 
 
 62
 In McComb, the Administrator of the Wage and Hour Division of the U.S. Department of Labor sought to enjoin Jacksonville Paper Company from violating the Fair Labor Standards Act. 336 U.S. at 187, 69 S.Ct. at 497. The district court entered a decree requiring the company, among other things, to pay its employees a prescribed minimum wage and overtime pay. Because the company ignored these requirements, the Administrator instituted a civil contempt proceeding and sought to recover the backpay owed to the employees under the court's order. The district court held that it lacked the power, on the application of the Administrator, to award damages to the employees, and the court of appeals affirmed.
 
 
 63
 The Supreme Court reversed. Contrary to plaintiffs' intimations, however, it did not hold that the district court, in all instances, has the authority to award civil contempt damages to non-parties. Rather, the Court simply stated that the district court, having ordered the company to make certain wage payments, has the power "to grant the relief that is necessary to effect compliance with its decree," id. at 193, 69 S.Ct. at 500, i.e., to require the company to pay the prescribed wages. In other words, the backpay award was meant to force the dilatory company to comply with the terms of the court's decree, and compensating the employees was only an incidental effect of the court's vindication of its order.
 
 
 64
 In fact, courts regularly hold employers in civil contempt when they disregard injunctions against violation of the minimum and overtime wage rates required by the Fair Labor Standards Act. See e.g., Usery v. Fisher, 565 F.2d 137, 139-40 (10th Cir.1977); Hodgson v. A-1 Ambulance Service, Inc., 455 F.2d 372, 374-75 (8th Cir.1972); Fleming v. Warshawsky & Co., 123 F.2d 622, 626 (7th Cir.1941). To compel these violators to "purge" themselves of their contempt, courts routinely order employers to pay the amounts due to employees under the courts' earlier orders. These opinions speak primarily in terms of purging the employers of their contempt, not of making the injured employees whole. We think that the courts' use of the word "purge" indicates that the main purpose of the contempt orders is to undo the contemnors' violations of the decrees. Such purging is not possible in this case. If the district court had levied a civil contempt fine on defendants for blockading CHWC, that order would not have undone the defendants' contempt. Instead, it simply would have compensated CHWC for its losses.
 
 
 65
 The Fifth Circuit, in Northside Realty Associates, Inc. v. United States, 605 F.2d 1348 (5th Cir.1979), similarly interpreted McComb. In that case, the Government alleged that Northside, a real estate agency, refused to sell houses to black purchasers in violation of the Fair Housing Act. Id. at 1350. The district court enjoined Northside from engaging in such discriminatory conduct. When Northside violated this injunction, the Government moved to hold Northside in civil contempt and also requested monetary damages for the aggrieved purchasers. The district court, however, declined to award damages to non-parties.
 
 
 66
 The Fifth Circuit affirmed. Citing McComb, the court noted that civil contempt serves two purposes: "to compensate the prevailing party for losses or damages caused by the other's noncompliance and to coerce the derelict party into compliance with the original injunction." Id. at 1356 (emphasis added and footnote omitted). As a result, the Fifth Circuit agreed that the district court was powerless to award damages to the prospective purchasers. First, the court noted that "the award would not compensate the complaining party--the Government." Id. Second, the court maintained that an award of monetary damages would not coerce Northside into complying with the court's original injunction. The court remarked that such an award was unlikely to ensure future compliance:
 
 
 67
 [S]uch an award would have at best a tangential effect in coercing future compliance with the Court's decree. The sort of relief sought by the Government here, monetary damages for individual housing discriminatees, is a purely legal remedy ... which compensates for past wrongs. The enforcement purpose of a contempt order is much better served by ordering ... the payment of a daily fine in the event of noncompliance with the Court's order.
 
 
 68
 Id. at 1356-57 (citations omitted).
 
 
 69
 The instant case is more analogous to Northside Realty than to McComb. The district court cannot coerce Operation Rescue into complying with the terms of its injunction by awarding damages to CHWC. The difference between McComb and this case rests in the nature of the underlying injunction. In McComb, the decree required the defendant to make a monetary payment. Here, however, the court enjoined the defendants from blockading abortion clinics. In the former situation, it would be counter-intuitive to say that the court cannot order the dilatory defendant to pay, as a civil contempt fine, the delinquent sum and then order imprisonment if defendant's recalcitrance continues. In our situation, as in Northside Realty, awarding damages to CHWC will not coerce defendants into adhering to the terms of the injunction. Under the circumstances of this case, the only avenue available to the district court to coerce defendants into complying with its injunction is the means it actually employed--i.e., the imposition of a conditional coercive fine.[16] Requiring defendants to reimburse CHWC for its losses thus would be purely compensatory.[17]
 
 
 70
 As the Supreme Court stated in Gompers, "[p]roceedings for civil contempt are between the original parties." 221 U.S. at 444-45, 31 S.Ct. at 499. A court should only deviate from this rule and award damages to non-parties when such an order directly compels adherence to a prior decree. If the decree involves the payment of money, the court can compel compliance by ordering the delinquent party to pay the required sums. By contrast, awarding damages to CHWC in this case will not coerce Operation Rescue into complying with the TRO, and therefore, exceeds the district court's authority.
 
 V. CONCLUSION
 
 71
 For all of the foregoing reasons, we will affirm the district court's order insofar as it grants plaintiffs a permanent injunction and refuses to award CHWC (a non-party) civil contempt damages. We will, however, reverse the district court's order insofar as it dismisses RHCC, Planned Parenthood, AWC, and NARAL/PA from the action for lack of standing, and we will remand the case to the district court for the entry of orders consistent with this opinion.
 
 
 
 [1]
 The court ultimately granted plaintiffs' voluntary motion to dismiss their claims for money damages
 
 
 [2]
 These included Women's Suburban Clinic ("WSC"), the Northeast Women's Center ("NEWC"), and the Elizabeth Blackwell Health Center ("Blackwell") (all of which remained plaintiffs throughout the litigation), and Reproductive Health and Counseling Center ("RHCC"), Allentown Women's Center ("AWC"), Planned Parenthood of Southeastern Pennsylvania ("Planned Parenthood"), and Women's Medical Services ("WMS"). The district court dismissed these last four clinics for lack of standing
 
 
 [3]
 The Cherry Hill Women's Center ("CHWC"), a non-party clinic that was included in the court's temporary restraining order, has also appealed the district court's refusal to award it civil contempt damages
 
 
 [4]
 One non-defendant, Tina Krail, who was held in civil contempt for violating the district court's temporary restraining order, also joins in the appeal
 
 
 [5]
 We recognize that two pregnant women, Jane Roe and Mary Moe, were among the original plaintiffs in this lawsuit. But the situation existing at the inception of this case differed significantly from the situation that exists now. In June of 1988, plaintiffs knew that Operation Rescue was planning to blockade abortion clinics during a specific week. It was therefore readily apparent that Operation Rescue presented a real and immediate threat to women, such as Roe and Moe, who had scheduled abortions during that particular week. Now, however, the dates of defendants' future demonstrations are unknown, and women thus cannot foresee when their rights will be directly threatened by these protests
 
 
 [6]
 We do not think that our decision is at odds with Keith v. Daley, 764 F.2d 1265 (7th Cir.), cert. denied, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985). In Keith, the court rejected the Illinois Pro-Life Coalition's Rule 24(a)(2) motion to intervene as of right in a lawsuit challenging the constitutionality of an Illinois statute regulating abortion. The IPC, because it was the chief proponent of the statute in the Illinois legislature, asserted as an interest justifying intervention its intensive lobbying efforts. Id. at 1267. The Seventh Circuit, however, found this interest insufficiently direct and substantial to support intervention, noting that the named defendants--i.e., the Attorney General and Cook County State's Attorney--were adequately defending the statute. Id. at 1270. This case is easily distinguishable, for the Keith decision may be explained by the court's unwillingness to allow lobbyists to intervene in every lawsuit that challenges a statute they helped to enact
 The Keith court similarly rejected the IPC's additional argument that it should be permitted to intervene due to its members' interests as guardians of fetal rights and potential adoptive parents of fetuses "born alive." The court found the former interest unavailing because the law does not recognize fetal rights and the latter interest inadequate because it was too speculative. Id. at 1271-72. Neither of these points are applicable to this case. Under the Supreme Court's present jurisprudence, there is clearly a constitutional right to abortion, and there is a real risk that NARAL/PA's female members will be deprived of that right by defendants' activities.
 
 
 [7]
 The district court held that "[e]ach" of plaintiffs' federal and state claims, if found meritorious, could "provide a basis for the granting of permanent injunctive relief."
 
 
 [8]
 There are three prerequisites for permanent injunctive relief:
 First, the plaintiff must demonstrate that the court's exercise of equity jurisdiction is proper. Second, the plaintiff must actually succeed on the merits of its claims. Third, the plaintiff must show that the balance of equities tips in favor of injunctive relief.
 Northeast Women's Center, Inc. v. McMonagle, 665 F.Supp. 1147, 1152-53 (E.D.Pa.1987) (citations omitted). The first prerequisite has three additional subparts. The plaintiff must show that: (1) he has no adequate legal remedy; (2) the threatened injury is real, not imagined; and (3) no equitable defenses exist. See id. at 1153.
 
 
 [9]
 Because of defendants' protests, WSC could only receive two of its thirty-seven scheduled patients on July 5, 1988. The court awarded WSC its full payroll cost for the day: $1,420.70. Similarly, NEWC was only able to handle five of its thirty-seven scheduled patients because of defendants' protests. The court awarded NEWC its full payroll cost minus the amount of time that was necessary to provide services for five patients. Defendants do not argue that these figures are unsupported by the record or an abuse of discretion. It is clear to us that they are neither
 
 
 [10]
 Defendants also do not challenge the coercive contempt fines as an abuse of discretion or as unsupported by the record. Instead, defendants argue that these fines are criminal in nature
 
 
 [11]
 Defendants rely on a Pennsylvania Supreme Court case, Crozer-Chester Med. Center v. Moran, 522 Pa. 124, 560 A.2d 133 (1989), which classified an arguably comparable contempt fine as criminal under state law. This reliance is misplaced. The case at bar involves a contempt fine imposed by a federal court for violation of a federal-court order. Once the district court issued the TRO, federal law prohibited defendants from violating its provisions. Accordingly, federal law governs the forms of relief available to the district court to remedy defendants' violation of its TRO. Therefore, a Pennsylvania court's classification of an analogous fine as criminal in no way controls our determination. See Hicks, 485 U.S. at 630, 108 S.Ct. at 1429 ("[T]he characterization of [a contempt] proceeding and the relief given as civil or criminal in nature, for purposes of determining the proper applicability of federal constitutional protections, raises a question of federal law rather than state law.")
 
 
 [12]
 The defendants also rely on 18 U.S.C. Secs. 402 and 3691 to support their claim that the procedural protections afforded them by the district court were unconstitutionally defective. These sections, however, apply only to criminal contempt proceedings. Because the district court's sanctions are manifestly civil in nature, these provisions are inapplicable
 
 
 [13]
 The TRO provided, inter alia:
 Defendants, the officers, directors, agents and representatives of defendants, and all other persons acting in concert with them are
 (1) enjoined and restrained in any manner or by any means from:
 (a) trespassing on, blocking, obstructing ingress or egress from any facility at which abortions are performed in the City of Philadelphia or metropolitan area (including the City of Allentown) from July 4, 1988 to July 9, 1988 inclusive and,
 (b) physically abusing or tortiously harassing persons entering, leaving, working at, or using any services at any facility at which abortions are performed in the City of Philadelphia and the metropolitan area (including the City of Allentown) from July 4, 1988 to July 9, 1988, inclusive provided, that: (i) "sidewalk counseling," consisting of reasonably quiet conversation of a nonthreatening nature conducted by not more than two people for each person they are seeking to counsel, shall not be prohibited; (ii) no one is required to accept or listen to "sidewalk counseling" and should anyone decline such counseling, that person shall have the absolute right to leave or walk away without harassment; (iii) "sidewalk counseling" as defined here shall not limit the right of the Police Department and/or the United States Marshal to maintain public order by reasonably necessary rules and regulations as they decide are necessary at each particular demonstration site.
 
 
 [14]
 The district court stated that it would "design its restraining order so that both plaintiffs' interest in gaining access to the facilities and the defendants' interest in expressing their views are fairly considered." Accordingly, the court's order allowed defendants to engage in limited "sidewalk counseling." See supra note 13
 
 
 [15]
 Because Krail was present when the Marshals read the TRO to the demonstrators, her situation is not analogous to that presented in United States v. Gedraitis, 690 F.2d 351 (3d Cir.1982). In Gedraitis, we vacated one of the contempt convictions at issue because of a lack of evidence that the alleged contemnor had notice of the injunction. Id. at 356
 
 
 [16]
 This case may also be distinguished from McComb on the basis that the Administrator in McComb was suing on behalf of the aggrieved employees. In such a situation, which is somewhat akin to a class action, it is not contrary to the law of civil contempt to award compensatory damages to the members of the injured class. In contrast, it is less evident in this case than in McComb that the plaintiff clinics were acting in a representative capacity when they sought to enjoin defendants' protests
 
 
 [17]
 CHWC also maintains that the Second Circuit's decision in SEC v. American Bd. of Trade, Inc., 830 F.2d 431 (2d Cir.1987), supports its claim for damages. Although American Bd. of Trade is written expansively, its holding is consistent with our interpretation of McComb. The defendant in American Bd. of Trade violated an order forbidding the redemption of corporate notes and freezing corporate assets. Notwithstanding that the SEC was the plaintiff, the court, as a civil remedy, ordered the defendant to reimburse the corporation for funds spent in violation of the decree. These facts resemble McComb: the court prohibited the disposition of corporate assets, and when the defendant disregarded its order, the court compelled compliance by requiring the defendant to make restitution. American Bd. of Trade is couched in broad language, however, emphasizing the need "to protect persons who were not parties to the action." Id. at 441. Under our reading of McComb, such comments are gratuitous, for restitution was justified as a means to vindicate the court's decree. To the extent that American Bd. of Trade expands upon McComb, we disagree with it