**VIRGIN ISLANDS PORT AUTHORITY,** Ritz Carlton Virgin Islands, Inc., Caneel Bay Resort, and St. Thomas–St. John Hotel Association, Appellants/Cross Appellees,

v.

**VIRGIN ISLANDS TAXI ASSOCIATION,** Appellee/Cross Appellant,

Freddy Lettsome and East End Taxi Services, Inc., Nominal Appellees.

D.C. Civ App. Nos. 97–46, 97–47, 97–48 and 97–49.

District Court, Virgin Islands, Appellate Division, D. St. Thomas and St. John.

Considered May 8, 1997.

Decided Sept. 23, 1997.

Charles E. Engeman, Dudley, Topper & Feuerzeig, St. Thomas, U.S.V.I. for Caneel Bay, Inc. and St. Thomas–St. John Hotel Association, Inc.

Samuel H. Hall, Jr., Birch, De Jongh, Hindels & Hall, St. Thomas, U.S.V.I., for Ritz Carlton Virgin Islands, Inc.

Before MOORE, Chief Judge, BROTMAN, Senior District Judge, and EDGAR D. ROSS, Territorial Court Judge, Division of St. Croix.

## OPINION

PER CURIAM.

This appeal arises from a dispute over an exclusive airport taxicab transportation franchise granted to the appellee/cross appellant, Virgin Islands Taxi Association ["appellee" or "VITA"] by the Virgin Islands legislature. Appellants have appealed from the order of the Territorial Court granting a preliminary injunction enforcing the exclusive franchise. In deciding whether the preliminary injunction was warranted, this Court must first determine whether the exclusive franchise violates the Commerce Clause of the Constitution, and second, if constitutional, whether the conduct of the appellants as found by the Territorial Court is violative of that exclusive franchise. For the following reasons, we will affirm the trial court's grant of an injunction.

## I. FACTS

On December 29, 1986 the legislature of the Virgin Islands passed Act No. 5231 ["the Act"] which gave VITA the exclusive right to transport all persons, with certain exceptions, from the terminal of the Cyril E. King Airport ["airport"]. The airport is operated by the Virgin Islands Port Authority ["Port Authority"]. Section 1(e) of the Act provides that VITA is authorized to transport all persons

except those departing by foot, privately owned motor vehicle where no fee is charged, by motor vehicle furnished by a concessionaire of a motor vehicle rental (drive yourself) business at the terminal facility or by a motor vehicle owned, operated or utilized by a tour agent in the transportation of passengers traveling on a prepaid or packaged tour, which has a minimum price of $50 and includes either lodging or transportation on an ocean common carrier; provided that transportation from the terminal facility is part of the overall transportation arranged for in the prepaid or packaged tour.

(App. Vol. I at 253.)

VITA brought suit in the Territorial Court seeking enforcement of the exclusive franchise which VITA contended was being violated by the conduct of the Port Authority, Freddy Lettsome, Eastend Taxi Services, Inc., Ritz Carlton Virgin Islands, Inc., and Caneel Bay Resort. VITA sought a preliminary injunction to enjoin the Port Authority from "permitting and facilitating others from operating any type of public taxicab service from the Cyril E. King Airport on St. Thomas," and to enjoin the remaining appellants from violating VITA's exclusive franchise granted by the legislature. The trial court granted a temporary restraining order on February 13, 1997. The Hotel Association of St. Thomas and St. John, Inc. ["Hotel Association"] was allowed to intervene. A hearing on the preliminary injunction took place, over two days on February 26 and 27, 1997.

On March 10, 1997 the trial court granted the preliminary injunction in a written memorandum and order, noting that there were "numerous costly requirements that the Taxi Association had to fulfill in order to maintain this franchise and to ensure that the public's needs for transportation were met." *Virgin Islands Taxi Ass'n v. Virgin Islands Port Auth.*, Civ. No. 117/97, memorandum opinion at 3, 1997 WL 143960 (Mar. 10, 1997) ["Mem. Op."]. The judge further observed that many months of violation of the franchise has resulted in incalculable losses to VITA. (Mem. Op. at 5.) The erosion of the franchise was a

result of hotels and other lodging providers contracting with non-VIFA taxi companies to transport guests directly to their accommodations. Caneel Bay, Inc. and the Ritz Carlton, rather than the guests, generally paid the drivers directly. However, the court noted "many instances ... in which the Ritz Canton's representative at the airport has openly solicited the hotel's guests in the terminal area and arranged right there transportation with other non-Taxi Association members." (*Id.*) Other hotels and managers of vacation rental homes also contracted with non-VITA taxi companies to transport guests, and those guests paid the drivers directly. One such taxi driver, in addition to picking up designated guests, also had "conspicuously solicited other travelers at the airport, and in fact, [had] distributed his business cards to persons disembarking from flights as they entered the terminal area." (*Id.* at 6–7.)

The court described the scene typical at the airport after a large aircraft has landed as chaotic. Although the Port Authority had restricted VITA members from entering the baggage area, non-VITA taxicab drivers freely entered the baggage area without interference from the Port Authority. In addition, those non-VITA drivers "cause[d] congestion in the roadway adjacent to the terminal by parking on both sides of the curbs." (*Id.* at 7.) Despite VITA's repeated complaints to the Port Authority, the Port Authority took no legal action to enforce the Act's provisions besides a stern letter to nine hotels concerning the infractions. (*Id.* at 8.)

The Port Authority, Ritz Carlton Virgin Islands, Inc., Caneel Bay Resort, and the Hotel Association ["appellants"] have timely appealed the preliminary injunctive order.[1] VITA cross-appealed the court's apparent finding that "the hotels are permitted to have their own private or courtesy vehicles pick up their guests at the airport." (*Id.* at 13.) For the following reasons, we will affirm.

## II. DISCUSSION

The Territorial Court had jurisdiction over this matter under 4 V.I.C. § 76(a). We have

---

1. The appellants also filed a motion to stay enforcement of the preliminary injunction pending appeal. Because we are affirming the Territorial Court's injunction, that motion is moot.

jurisdiction to review the court's order pursuant to section 23A of the Revised Organic Act.[2] Preliminary injunctions are appealable interlocutory orders. *Accord* 28 U.S.C. § 1292(a)(1). Our review of the trial court's conclusions of law is plenary. *Thomas v. Abamar–BB*, 35 V.I. 117, 934 F.Supp. 164 (D.V.I.App.Div.1996). Findings of fact are reviewed under a clearly erroneous standard. V.I. CODE ANN. tit. 4, § 33. The grant or denial of an injunction is reviewed for abuse of discretion. *Joseph v. Henry*, 958 F.Supp. 238, 243 (D.V.I.App.Div.1997).

A preliminary injunction is appropriate if: (1) immediate and irreparable injury, loss, or damage will occur unless the injunctive relief is granted; (2) there is a likelihood of success on the merits; (3) that upon balancing the hardships there will be no substantial harm to the opposing party; and (4) it is in the public's interest to grant the relief. *Id.;* 11A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE §§ 2948–2948.4 (1995). The trial court did not abuse its discretion when, after weighing the factors, it concluded that VITA was entitled to a preliminary injunction.

## A. Likelihood of Success on the Merits

Appellants contend that the trial court erred when it found a likelihood of success on the merits. They argue that Act No. 5231 granting VITA the exclusive franchise is unconstitutional because it violates the Commerce Clause. We conclude that the Act does not violate the Commerce Clause, although for reasons different from the trial court. The appellants also contend that even if the Act is constitutional, the conduct complained of fits within one of the exceptions to the Act. We find that the Territorial Court's findings of fact concerning violations are not clearly erroneous.

### 1. Constitutionality of Act No. 5231

The Commerce Clause grants to Congress the power to regulate commerce among the several states. U.S. Const. art. I, § 8, cl. 3. This clause has been interpreted as not only an affirmative grant of power to Congress, but also a limitation upon the states' ability to regulate interstate commerce. This negative aspect of the clause is referred to as the "dormant" Commerce Clause. *Oregon Waste Sys. v. Department of Envtl. Quality*, 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). Although the Commerce Clause has not been made applicable to the Virgin Islands by Congress in section 3 of the Revised Organic Act,[3] the limitations implied in the Commerce Clause have been held to be applicable to the Virgin Islands through the Territorial Clause, Article IV, § 2 of the Constitution. *Polychrome Int'l Corp. v. Krigger*, 5 F.3d 1522, 1534 (3d Cir. 1993).

A threshold inquiry in dormant Commerce Clause analysis is whether interstate commerce is even at issue. *C & A Carbone Inc. v. Town of Clarkstown, New York*, 511 U.S. 383, 389, 114 S.Ct. 1677, 1681, 128 L.Ed.2d 399 (1994) (determining at outset whether ordinance affected interstate commerce). Thus, once a regulation is deemed to affect interstate commerce, there are several levels of scrutiny to determine whether such a regulation violates the Commerce Clause. State action that constitutes "simple economic protectionism" and discriminates against out-of-state interests or in favor of in-state interests is subject to a heightened level of scrutiny, and will most likely be struck down as unconstitutional. *Tolchin v. Supreme Court of New Jersey*, 111 F.3d 1099, 1106 (3d Cir.1997); *Jackson v. West Indian Co.*, 944 F.Supp. 423, 430 (D.V.I. 1996). However if the challenged law only indirectly affects interstate commerce and

**2.** Revised Organic Act of 1954 § 23A; 48 U.S.C. § 1613a. The Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541–1645 (1995), *reprinted in* V.I. CODE ANN., Historical Documents, 73–177(1995) (codified as amended) ["Revised Organic Act"].

**3.** 48 U.S.C. § 1561. Such "non-fundamental" provisions of the Constitution are applicable to

an unincorporated territory, such as the Virgin Islands, only to the extent Congress makes them applicable. *Balzac v. Porto Rico*, 258 U.S. 298, 312–13, 42 S.Ct. 343, 348, 66 L.Ed. 627 (1922); *Downes v. Bidwell*, 182 U.S. 244, 266–67, 21 S.Ct. 770, 779, 45 L.Ed. 1088 (1901); *cf. Dorr v. United States*, 195 U.S. 138, 145, 149, 24 S.Ct. 808, 811, 813, 49 L.Ed. 128 (1904).

regulates evenhandedly, the court applies a less rigid balancing test to determine whether the law imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970); *Tolchin*, 111 F.3d at 1106 (citations omitted); *Jackson*, 944 F.Supp. at 430 (citation omitted).

There are two lines of cases relevant to deciding whether this exclusive franchise violates the Commerce Clause. Appellants argue that the Supreme Court case of *Carbone* and its progeny control this decision. In *Carbone* the Supreme Court found an ordinance unconstitutional because it "deprive[d] out-of-state businesses of access to a local market." 511 U.S. at 389, 114 S.Ct. at 1681. Thus, an analysis relying on *Carbone* would focus upon defining the "article of commerce" at issue and determining whether the franchise denies access to the market dealing with that article of commerce. The second line of authority specifically deals with the validity of exclusive taxicab franchises. *See, e.g., Southerland v. St. Croix Taxicab Ass'n*, 315 F.2d 364 (3d Cir.1963); *Jackson*, 944 F.Supp. at 423; *Pennsylvania Coach Lines, Inc. v. Port Auth. of Allegheny*, 874 F.Supp. 666 (W.D.Pa.1994). These cases focus on the challenged franchise's impact upon the traveler, and many turn on whether travel from the airport is considered interstate travel or simply local, intrastate travel. We find the exclusive franchise constitutional whether analyzed from the point of view of its regulation of access to the relevant market or its impact on travelers.

a. Regulation of Transportation Market

Relying on *Carbone*, appellants argue that the exclusive franchise granted by the Act constitutes "pure and simple local economic protectionism" whose goal is to deny all access by off-island businesses to the local market. (Brief of Appellants–Hotel Association et al. at 26.) They contend that it discriminates against interstate commerce and should thus be struck down as per se invalid. In *Carbone*, a local ordinance directed that all solid waste had to be processed at one local designated transfer station before it left

the town. 511 U.S. at 390, 114 S.Ct. at 1682. Plaintiff was therefore prohibited from directly shipping its solid waste to be processed at an out-of-state facility. *Id.* at 388, 114 S.Ct. at 1681. The Court stated that with respect to the stream of commerce at issue, defined as the service of processing and disposing of solid waste, the ordinance allowed *only* the favored local operator to process the waste. *Id.* at 391, 114 S.Ct. at 1682. Thus the ordinance "deprive[d] out-of-state business of access to a local market." *Id.* at 389, 114 S.Ct. at 1681. The Court found this type of ordinance to be discriminatory and therefore per se invalid.

■ Simply because Act No. § 231 grants an exclusive franchise to VITA does not automatically render it discriminatory against out-of-state business. Local governments historically have possessed the power to grant exclusive franchises for the health and safety of their citizens. *See, e.g., Harvey & Harvey, Inc. v. County of Chester*, 68 F.3d 788, 803 (3d Cir.1995) ("As in the public utility context ... local governments have the capacity, in the practical exercise of their police powers, which are at their strongest in the health and safety area, to contract with specific businesses to provide certain services.") The Territorial Court found that the intent of the legislature was to "have accessible transportation for the entire public" available at the airport. (Mem. Op. at 66.) Appellants contend that the intent of the legislature was economic protectionism of a favored local business and cite various statements made by Virgin Islands Senators during debate over the passage of the bill which became Act No. 5231. The legislative history also shows, however, that Senators were concerned with providing reliable taxi service at the airport.

In their effort to prove that Act No. 5231 is protectionist legislation, appellants note repeatedly that the Act's fifth whereas clause "states that one of its purposes is to protect the Taxi Association from competition." (Brief of Appellants–Hotel Association et al. at 28; Reply Br. of Appellants–Hotel Association et al. at 9.) If this were an accurate characterization of this clause, the argument might have more weight. The fifth whereas

clause, however, finds it to be in the public interest for VITA to be protected against **unfair and debilitating** competition. The clause states, in pertinent part:

> WHEREAS it is in order that the Virgin Islands Taxi Association, Inc. and the St. Croix Taxicab Association, Inc. sustain the present level of services and be protected from unfair and debilitating competition which would undermine the normal transportation services and stable economics of public taxicab service from the Cyril E. King Airport on the Island of St. Thomas. . . .

Act No. 5231, cl. 5. The Constitution and federal law permit, and even promote, free enterprise and competition. The law further prohibits unfair competition. *See, e.g.,* 15 U.S.C. §§ 1–7 (Sherman Anti–Trust Laws); V.I. CODE ANN., tit. 11, §§ 1501–18 (Virgin Islands Anti–Monopoly Law). The clause *as a whole* indicates that the goal of the legislation was to serve the public interest by providing reliable and efficient taxicab service for all travelers to and from the Cyril E. King Airport on St. Thomas, including those who may be considered interstate travelers.[4]

Moreover, the Act does not deprive out-of-state businesses from all access to the local market. The stream of commerce at issue here is the land transportation on St. Thomas of travelers from the airport. The franchise does not prevent off-island businesses from competing in that market, for example, by providing rental car transportation or competing for prearranged tour transportation. Other courts have distinguished *Carbone* based upon the fact that the challenged act did not deny *all* access to the relevant commercial market. *See, e.g., Tolchin,* 111 F.3d at 1099 (upholding bar membership requirement of maintaining a bona fide in-state office because such requirement did not deprive out-of-state attorneys all access to legal market); *Gary D. Peake Excavating v. Town Bd. of Hancock,* 93 F.3d 68, 75 (2d Cir.1996) (upholding law that prohibited dumping of any waste in the town except at town operated transfer station because such a law did not prohibit town waste from being handled by any out-of-town competitor).

Just as the law in *Peake Excavating* merely denied out-of-town competitors from competing in a certain way, i.e. by building competing transfer stations within the town, the Virgin Islands Act merely denies off-island competitors from competing in the airport traveler transportation market by only one method. Competitors outside of the Territory are prevented only from providing non-prearranged taxicab service at the airport. Similarly, just as the law in *Tolchin* required out-of-state attorneys to maintain bona fide offices before practicing law, this Act requires off-island competitors to follow the proper procedure for operating a tour business or rental car business at the airport. Because out-of-state competitors are not completely deprived of access to the relevant market, the heightened scrutiny standard of *Carbone* is inapplicable. *Tolchin,* 111 F.3d at 1108.

Because we find the exclusive franchise to be non-discriminatory, it may be upheld under a balancing test. We find that the burden on interstate commerce, defined as the on-island transportation of travelers departing from the airport, is not "clearly excessive in relation to the putative local benefits." *Pike,* 397 U.S. at 142, 90 S.Ct. at 847. We agree with the trial court that any burden imposed by the exclusive franchise on the free flow of island transportation is outweighed by the local benefits of ensuring reliable transportation for all travelers at the airport.

#### b. Interstate or Intrastate Travel

The exclusive franchise of Act 5231 also bears examining from the perspective of its impact on the arriving air passenger, for the Commerce Clause has no relevance to members of the traveling public who are not in interstate commerce. The question is whether these passengers cease to be 'interstate travelers' and become local or 'intrastate travelers' once they disembark the airplane

---

4. The Territory of the Virgin Islands has authority to grant an exclusive franchise to a taxicab association to operate taxicabs in certain areas and under certain circumstances. *See Souther-land v. St. Croix Taxicab Ass'n,* 315 F.2d 364, 367 (3d Cir.1963); *see also* App. Vol. II at 34, 45 (appellants concede that legislature has authority to enact such legislation).

at the Cyril E. King Airport on St. Thomas. Appellants contend that their guests are still in the stream of commerce when they are traveling from the airport to their hotels, and are not just local travelers. Thus, prohibiting these guests from traveling in the taxicabs selected by the appellants violates the Commerce Clause based on *Southerland,* 315 F.2d at 368–69.

Understanding this argument and why we reject it requires discussion of the Supreme Court's ruling that local taxicab transportation of travelers picked up at a station who have arrived from out of state does not necessarily entail interstate travel. *United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

> [A] traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and ... his journey ends when he disembarks at the station in the city of destination. What happens prior or subsequent to that rail journey, **at least in the absence of some special arrangement,** is not a constituent part of the interstate movement. The traveler has complete freedom to arrive at or leave the station by taxicab, trolley, bus, subway, elevated train, private automobile, his own two legs, or various other means of conveyance. Taxicab service is thus but one of the many that may be used. It is contracted for independently of the railroad journey and may be utilized whenever the traveler so desires. From the standpoints of time and continuity, the taxicab trip may be quite distinct and separate from the interstate journey. To the taxicab driver, it is just another local fare.

*Id.* at 231–32, 67 S.Ct. at 1567 (emphasis added). Relying on *Yellow Cab,* many courts have similarly held that taxicab service from airports does not constitute interstate travel. *Evanston Cab Co. v. City of Chicago,* 325 F.2d 907 (7th Cir.1963) (a "local ride in a local taxi-cab" does not affect interstate commerce); *Airport Taxi Cab Advisory Comm. v. City of Atlanta,* 584 F.Supp. 961, 964 (N.D.Ga.1983) (same). Based upon this rea-

soning, courts have upheld laws that regulate the taxicab service at airports against Commerce Clause challenges. *See, e.g., Airport Taxi Cab Advisory Comm.,* 584 F.Supp. at 965.

Special arrangements, however, can render local taxicab transportation a constituent part of interstate travel. For example, in *Southerland,* the Third Circuit Court of Appeals invalidated an exclusive airport taxicab transportation franchise on St. Croix, Virgin Islands. The court found the franchise to be unduly burdensome on interstate commerce because it prohibited Mr. Southerland from picking up passengers arriving from the United States with whom he had made a prior contract to transport to their hotels as part of a package tour. *Id.* at 368–69. The Court of Appeals, in distinguishing *Yellow Cab,* held that the passengers who had prearranged their transportation

> were in the stream of commerce from the time they left their homes until they returned home again. This is not a situation where the transportation from the airport to the hotel was local haulage in the sense that the traveler's interstate journey had ended at the airport at which point he could independently contract for his transportation service to his hotel by a conveyance of his choice. On the contrary, the transportation of these individuals had been arranged for them and paid for in advance as an integral part of their all-expense interstate journey.

*Id.* at 369. The court went on to state that

> [t]o force an individual engaged in an interstate journey ... to abandon that transportation for which he has paid and which will provide him with the type of vehicle and insurance protection he desires and employ a local taxicab operator who may well not provide him with either is clearly to impose an unwarranted burden on the interstate commerce involved.

*Id.*[5]

■ This Court disagrees that all of appellants' guests should be deemed to be travel-

5. In a decision relied upon by the trial court, the Trial Division of this Court has upheld an exclu- sive franchise that provided an exception for tour operators. *See Jackson v. West Indian Co.,* 944

ing interstate upon and after arrival on St. Thomas. Even in *Southerland,* the Court of Appeals recognized the "situation where the transportation from the airport to the hotel was local haulage in the sense that the traveler's interstate journey had ended at the airport at which point he could independently contract for his transportation service to his hotel by a conveyance of his own choice." 315 F.2d at 369. Consequently, whether a particular guest may be considered as still traveling in interstate commerce at the time she arrives at the airport depends on whether a specific type of ground transportation already has been arranged before her arrival.

■ If a guest has prepaid and prearranged through the hotel for transportation to the hotel, she may still be in the stream of interstate commerce, and prohibiting such a guest from traveling in the prearranged taxicab could run afoul of the Commerce Clause. Act No. 5231's "tour operator" exemption specifically provides that such a hotel guest may travel from the airport terminal to the hotel in a non-VITA vehicle operated by a taxi operator or tour operator as part of a prearranged package. Accordingly, the Act does not violate the rule established in

*Southerland,* and is constitutional since travelers who arrive at the airport without prearranged and prepaid package tours, including appellants' guests, thereupon become local, intrastate travelers.[6]

### 2. Conduct in Violation of Act

Having concluded that Act No. 5231 does not violate the Commerce Clause, the next issue relevant to the determination of likelihood of success on the merits is whether the appellants' conduct violated the Act. Appellants argue that their actions in picking up hotel guests pursuant to prearranged contracts falls under the "tour agent" portion of the exemptions in section 1(e) of the Act.

The proper construction of the Act's exemptions is aided by rules provided by the Port Authority. Those rules state the following with respect to tour operators:

> Persons not holding valid vouchers or receipts and requesting transportation for any tour operator shall be directed to the taxi dispatcher at the facility.

> Valid voucher or receipt shall be any voucher or receipt evidencing a contractual relationship between a passenger and a

F.Supp. 423, 431 (D.Vi.1996). Because the exclusive franchise in *Jackson* only concerned 'independent' cruise ship passengers, i.e. those passengers who had not signed up for package tours, it did not violate the rule established in *Southerland.* 315 F.2d at 368–69. Tour operators were allowed to pick up those passengers who had signed up for the prearranged tours. Underlying the rationale in *Jackson* is the precept that the passengers who had not prearranged transportation before arriving on St. Thomas became 'intrastate travelers' and left the stream of interstate commerce once they got off the ship at the dock in St. Thomas harbor and sought local transportation around the island.

The facts of this case are distinguishable from another recent decision in the Trial Division of this Court, *Everett v. Schneider,* Civ. No. 95–173F, Mem. Op. (D.V.I. Apr. 24, 1997). In *Everett,* travelers from the United States who had arranged to rent automobiles in St. Thomas as part of their trip to St. John would have been in the stream of commerce from the time they left their homes until they returned home again. *Slip Op.* at 9. Therefore, the situation was more analogous to *Southerland* than to *Jackson.* The court concluded that plaintiffs were likely to succeed with a Commerce Clause challenge to a local law prohibiting the transportation of St. Thomas rental cars to St. John.

**6.** Exclusive franchises have also been upheld based on the fact that the impact on out-of-state and in-state competitors was equal. *See Jackson,* 944 F.Supp. at 430–32 (relying on *Norfolk Southern Corp. v. Oberly,* 822 F.2d 388, 406 (3d Cir. 1987)); *Pennsylvania Coach Lines v. Port Authority of Allegheny,* 874 F.Supp. 666 (W.D.Pa.). The trial court below relied on such reasoning. (Mem. Op. at 11.) This justification, however, appears no longer to be valid in light of the Supreme Court's ruling in *C & A Carbone, Inc. v. Town of Clarkstown, New York,* 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). The Court in *Carbone* held that a law which simply favors one in-state business, thus burdening all other in-state and out-of-state businesses the same, can indeed implicate the Commerce Clause. *Id.* at 391, 114 S.Ct. at 1682; *Harvey & Harvey, Inc., v. County of Chester,* 68 F.3d 788, 798 (3d Cir.1995) ("*Carbone* explicitly rejected the argument that a disputed statute would have to favor all in-state businesses as a group—a statute may be invalid if it favors only a single or finite set of businesses.") Thus the exclusive airport franchise cannot be upheld simply on the basis that it burdens equally all those Virgin Islands-based and non-Virgin Islands-based taxi operators who are not members of VITA.

taxi operator or tour operator. Such voucher or receipt must bear the name of the taxi or tour operator and must bear words of "right" or "entitlement".

Ex: This voucher entitles its holder to a roundtrip fare from the Cyril E. King Airport *Ace Taxi and Tour Service.*

Tour Operators operating from any VIPA facility shall transport therefrom only passengers who are holding valid vouchers or receipt; except, persons travelling in a group for which the tour operator has a contract to transport such group.

Cash Transactions between Tour Operators and passengers shall be deemed evidence of solicitation of passengers by the Tour Operator.

(App. Vol. I at 84.) [7]

■ Appellants argue that their use of non-VITA taxicabs to transport guests falls within the 'taxi or tour operator' exception. This Court holds, however, that to come within this exemption, an appellant at a minimum has to comply with the Port Authority rules governing taxi and tour operators. Specifically, the appellants must provide valid vouchers or receipts to their guests who have prearranged ground transportation. The facts as found by the lower court are that none of the appellants had complied with the voucher or receipt requirement to show that their guests' ground transportation had been prepaid and prearranged. Indeed, the trial court specifically found that, while a particular hotel may have arranged for one of its contracted taxi drivers to pick up arriving guests, many times the guests had not prepaid or prearranged for such service but paid the taxi driver directly at the airport. The court also found that one of the non-VITA taxi drivers openly solicited travelers at the airport in clear violation of the exclusive franchise to VITA.[8] Accordingly, the tri-

al court's conclusion that appellees would likely succeed on the merits was proper.

**B. Irreparable Harm, Balance of Hardships, and Public Interest Factors**

■ The Territorial Court found that appellees would suffer irreparable harm absent the granting of a preliminary injunction. The court noted that VITA taxi drivers had "lost fares to innumerable others." (Mem. Op. at 9.) Irreparable harm includes the "impossibility of ascertaining with any accuracy the extent of the loss." (*Id.* at 9 (quoting *Foundry Servs., Inc. v. Beneflux Corp.,* 206 F.2d 214, 216 (2d Cir.1953) (Hand, J., concurring)).) Irreparable harm also exists if a legal remedy "would result in a multiplicity of lawsuits or if the action sought to be remedied is likely to recur often." *Wilkerson v. Sullivan,* 727 F.Supp. 925, 936 (E.D.Pa.1989). The lower court did not err in concluding that the circumstances of this case presented such a probability of irreparable harm.

■ The court's consideration of harm to the appellants and the public interest also was not clearly erroneous. The court concluded that any harm to the appellants was negligible because VITA "stands ready to work with the hotels and the Hotel Association to provide all guests with the quality service that is demanded and expected." (Mem. Op. at 18.) Any harm to the appellants is also mitigated by the fact that the taxicabs selected by the hotels could fall within the tour operator exemption so long as the rules governing tour operators are followed, e.g. use of valid vouchers or receipts. The court also concluded that the public interest favored the granting of the injunction because the exclusive franchise ensured that all travelers at the airport would be provided reliable transportation. (*Id.* at 19.) These conclusions were supported by the record

---

**7.** There were no objections to the rules being admitted into evidence. Counsel for VITA explained that these were "the rules that were provided by the VI Port Authority and the Taxi Association when they got this concession agreement." (App. Vol. II at 54.)

**8.** Appellants also argue that Act No. 5231 only governs "public taxicab service" from the airport. Appellants contend that their taxicabs are

"private cars for hire" and not public taxicabs. The franchise specifically authorized the transportation of "all persons" from the terminal. Thus the scope of the franchise clearly includes all persons not specifically excluded by section 1(e). Appellants' guests are therefore included in the franchise unless they depart the airport in a manner exempted from the exclusive franchise.

and do not amount to any abuse of discretion by the court.

## C. Scope of Injunction

Also disputed in this appeal is the precise scope of the injunction. Appellants complain that the injunction is nothing more than an "obey the law injunction," without indicating what acts of theirs specifically violate that law. (Brief of Appellants–Hotel Association et al. at 44.) As the trial court and this memorandum opinion make clear, appellants are on notice as to exactly what they must do to comply with Act No. 5231, and, if they so desire, how they may bring their conduct within the tour operator exemption of section 1(e). The actions of appellants' selected taxi-cab drivers picking up passengers without vouchers or receipts, openly soliciting passengers coming off the planes, and conducting cash transactions between guests and drivers were what the Territorial Court found violated the exclusive franchise. The discontinuance of those types of violative activities complies with the preliminary injunction.

## D. Cross Appeal

In finding that appellants would be unlikely to prevail on the merits by showing an undue burden on interstate commerce, the Territorial Court noted that

the hotels are permitted to have their own private or courtesy vehicles pick up their guests at the airport. Section 1(e) provides an exception to the franchise which enables transportation by a "privately owned motor vehicle where no fee is charged." Hence, since certain hotels are concerned about the treatment of their guests enroute from the airport, this means of transportation is certainly a viable alternative.

(Mem. Op. at 13.) In its cross appeal, VITA contends that hotels cannot came within the "privately owned motor vehicle" exception of Act No. 5231 by sending a hotel-owned vehicle to the airport to pick up hotel guests. Similarly, the Port Authority argues that this exception covers only private vehicles owned by private citizens. and does not apply broad-

ly to hotels or other commercial entities. (Brief of Appellant–Port Authority at 9.)

The Port Authority relies on provisions in Part II of Title 20 of the Virgin Islands Code for the licensing of motor vehicles. An "automobile for hire" is defined as "a motor vehicle operated for the purpose of transporting passengers for hire" and "passengers for hire" is defined to mean

occupants of a motor vehicle ... whose transportation in a motor vehicle operated on the highways of the Virgin Islands is furnished as incidental to the use, or as part of the cost for the use of any hotel, motel, guest house or other tourist-oriented facility, or any drive-yourself motor vehicle for lease nor [sic] limousines, which for purposes of this title, are defined as any large, luxurious sedan, driven by a chauffeur and for which the principal terms of service are contractually arranged and settled in advance.

20 V.I.C. § 101. Other provisions in Chapter 37 of Title 20 regulating automobiles for hire require special operators' licenses and badges, identification cards and 'taxi' medallions before an automobile for hire can be operated. VITA therefore asserts that a hotel cannot just go out an buy a vehicle to transport its guests from the airport.

Appellants Caneel Bay and Ritz Carlton, and intervenor Hotel Association, on the other hand, suggest that during the preliminary injunction hearing below, VITA's witness testified that if a hotel such as the Ritz–Carlton used a privately owned limousine to pick up a hotel guest at the airport as part of an arrangement that was worked out in advance with the guest, such transportation in the hotel's vehicle would not violate the terms of the franchise agreement. (Reply Brief of Appellants–Hotel Association et al. at 11; App. Vol. II at 165–71.)

In deciding whether to defer this issue to a decision on the merits of the case, this Court notes that now before it are only the Territorial Court's determination that the Act does not violate the Commerce Clause and its preliminary injunction against violating the exclusive franchise negotiated under the Act. The trial court recognized that the "privately owned motor vehicle exception" may permit

a hotel to use a private vehicle to transport its guests when no fee is charged, but did not define the scope of this exception. While the definition of an "automobile for hire" in the Virgin Islands Code does not necessarily preclude a determination that hotel-owned vehicles can be considered private vehicles for purposes of the exemption in the Act, and nothing in the Act indicates that privately owned motor vehicles cannot include hotel-owned vehicles, resolution of this question should await a trial on the merits.

For the foregoing reasons, we will affirm the Territorial Court.