**EAST END TAXI SERVICES, INC., Appellant**

**v.**

**VIRGIN ISLANDS TAXI ASSOCIATION, INC., Appellee**

**VIRGIN ISLANDS PORT AUTHORITY, Appellant**

**v.**

**VIRGIN ISLANDS TAXI ASSOCIATION, INC., Appellee**

**CBI ACQUISITIONS, LLC, d/b/a/ CANEEL BAY RESORT, Appellant**

**v.**

**VIRGIN ISLANDS TAXI ASSOCIATION, INC., Appellee**

**RITZ-CARLTON VIRGIN ISLANDS, INC., Appellant**

**v.**

**VIRGIN ISLANDS TAXI ASSOCIATION, INC., Appellee**

**BRAD JENCKS, Appellant**

**v.**

**VIRGIN ISLANDS TAXI ASSOCIATION, INC., Appellee**

D.C. Civ. App. Nos. 2006-146, 2006-147, 2006-148, 2006-151 & 2006-152

District Court of the Virgin Islands

Division of St. Thomas and St. John

February 6, 2008

659

ALAN D. SMITH, ESQ., St. Thomas, U.S.V.I., *For appellant East End Taxi Services, Inc.*

HENRY V. CARR, III, ESQ., St. Thomas, U.S.V.I., *For appellant Virgin Islands Port Authority.*

CHARLES E. ENGEMAN, ESQ., St. Thomas, U.S.V.I., *For appellants CBI Acquisitions, Inc., d/b/a/ Caneel Bay Resort, the Ritz Carlton, and Brad Jencks.*

LEE J. ROHN, ESQ., St. Croix, U.S.V.I., *For appellee Virgin Islands Taxi Association.*

BROTMAN, *Senior Judge of the United States District Court for the District of New Jersey, sitting by designation*; THOMPSON, *Senior Judge of the United States District Court for the District of New Jersey, sitting by designation*; and D'ERAMO, *Judge of the Superior Court of the Virgin Islands, sitting by designation.*

## MEMORANDUM OPINION

(February 6, 2008)

The East End Taxi Association ("East End"), the Virgin Islands Port Authority ("VIPA"), CBI Acquisitions, Inc., d/b/a Caneel Bay Resort ("Caneel"), and the Ritz Carlton (the "Ritz") appeal from an order entered by the Superior Court[1] of the Virgin Islands (the "Superior Court") on

---

[1] At all times relevant to this appeal, the trial court was known as the Territorial Court of the Virgin Islands and its judges were referred to as Territorial Court Judges. Effective January 1, 2005, however, the name of the Territorial Court changed to Superior Court of the Virgin Islands. *See* Act of Oct. 29, 2004, No. 6687, sec. 6, § 2, 2004 V.I. Legis. 6687 (2004). Recognizing this renaming, we employ the terms Superior Court and Superior Court Judge.

June 13, 2006, holding them in contempt for violating the terms of a preliminary injunction issued on March 10, 1997, and continued by an order dated August 3, 2005. Additionally, the Ritz and Brad Jencks ("Jencks") (collectively, with East End, VIPA, Caneel, and the Ritz, the "appellants") appeal from a contempt order entered by the Superior Court on September 7, 2006, regarding violations of the same 1997 preliminary injunction.

## I. FACTS

On January 1, 1987, the Legislature of the Virgin Islands granted the Virgin Islands Taxi Association ("VITA") "the exclusive right to provide public taxicab service from the terminal facility" at the Cyril E. King Airport in St. Thomas, U.S. Virgin Islands. 1986 V.I. Sess. Laws No. 5231 (f) (Dec. 29, 1986) ("Act 5231" or the "Act").[2] Act 5231 stated that the franchise did not apply to tour operators transporting persons

> departing ... by a motor vehicle owned, operated, or utilized by a tour agent in the transportation of passengers traveling on a prepaid or packaged tour, which has a minimum price of $50 and includes either lodging or transportation on an ocean common carrier; provided that the transportation from the terminal facility is part of the overall transportation arranged for in the prepaid or packaged tour.

*Id.* at § 1 (e). VIPA issued rules governing the franchise (the "1987 Rules"), under which non-VITA tour operators could only transport passengers holding valid vouchers "evidencing a contractual relationship between a passenger and a ... Tour operator," bearing the tour operator's name, and containing "words of right or entitlement." 29 V.I.R. & Reg's § 543-725 (1987).

On February 12, 1997, VITA commenced an action in the Territorial Court (the "1997 Action") for declaratory and injunctive relief against East End, VIPA, Caneel, and the Ritz. VITA alleged that VIPA permitted and facilitated. East End, Caneel, the Ritz, and others to pick up passengers from the airport who were not traveling as part of a prepaid or package tour as contemplated by Act 5231. VITA claimed that East End

---

[2] Act 5231 granted a similar exclusive franchise to the St. Croix Taxi Association to provide all public taxicab service from the Alexander Hamilton Airport in St. Croix, U.S. Virgin Islands.

allowed and encouraged its drivers to solicit passengers in the airport terminal and transport them, in violation of VITA's franchise. Additionally, VITA alleged that the Ritz and Caneel violated the franchise by contracting with independent taxi drivers or firms to pick up guests at the airport who were not passengers on prepaid or package tours, as required under the franchise.

On February 13, 1997, the trial court granted VITA's motion for a temporary restraining order against East End, VIPA, Caneel, and the Ritz. A hearing on VITA's motion for a preliminary injunction was held on February 26-27, 1997.[3] On March 10, 1997, the Territorial Court entered a written order granting VITA's motion for a preliminary injunction and declaring Act 5231 to be constitutional under the Commerce Clause of the United States Constitution. *See VI Taxi Ass'n, Inc. v. VI Port Auth.*, 36 V.I. 43 (Terr. Ct. 1997). It stated:

> [W]hat has been happening for many months is an erosion of this franchise resulting in incalculable losses to it. Open solicitation of travelers at the terminal area by taxi drivers not affiliated with the Taxi Association as well as other taxi drivers picking up guests of hotels and various similar entities have occurred on a daily basis.

*Id.* at 46.

In particular, the Territorial Court found that Caneel:

> contracts with two taxi drivers to pick up its guests at the airport and either transport them to the Charlotte Amalie waterfront to take the ferry to St. John, or to the Red Hook dock. These taxi drivers are not members of the Taxi Association. It charges $50 for the transportation and then pays the driver directly. The guest is free to arrange separately for his own transportation, and if he does so, Caneel Bay does not charge the $50.00 fee.

*Id.* at 46-47.

With respect to the Ritz, the trial court found:

> It, too, usually contracts with a specific taxicab company to provide transportation for its guests from the airport to its facility. This com-

---

[3] The Territorial Court did not consolidate the hearing on the motion for a preliminary injunction with a trial on the merits.

pany, however, is not a member of the Taxi Association. . . . There have been many instances, though, in which the Ritz Carlton's representative at the airport has openly solicited the hotel's guests in the terminal area and arranged right there transportation with other non-Taxi Association members. In fact, these guests have ultimately paid a higher price for the transportation than if they had been transported by a member of the Taxi Association.

*Id.* at 47.

Additionally, the Territorial Court explained that Susan Fredrickson ("Fredrickson"), manager of Widespree Vacation Homes on St. John, coordinated with Freddy Lettsome ("Lettsome") of East End for transportation of guests from the airport in St. Thomas.

Ms. Fredrickson contacts Lettsome . . . and gives him the name of the guest. Lettsome arranges for one of East End's Taxi drivers to pick up the guest at the airport. The driver arrives at the airport with the name and flight information of the guest, and identifies himself to the guest by carrying a sign with the guest's name. The guest is then transported to the Red Hook dock and pays the taxi driver directly.

*Id.* at 47-48. The court added that amongst the "various non-Taxi Association drivers soliciting fares and handing out business cards," on a typical day at the airport, "[t]en to twenty members of East End Taxi hold up signs with travelers names on them." *Id.* at 48.

Regarding VIPA's role in the matter, the court found that "non-Taxi Association members freely enter the baggage area, an area from which the Port Authority has restricted the Taxi Association members." *Id.* In the Territorial Court's view, VIPA had

taken an equivocal position on enforcing the franchise. On the one hand, its executive director wrote a letter to nine hotels containing a stern warning that it was "the intent of the Virgin Islands Port Authority . . . to enforce the provisions [of the Act] to the maximum extent possible." On the other hand, as violations continued unabated, the Port Authority took no legal action to enforce the Act's provisions.

*Id.* at 48-49.

Based on the above conduct, the Territorial Court held that East End, VIPA, Caneel, and the Ritz had violated VITA's exclusive franchise on

taxicab service from the airport. However, it held that certain of Lettsome's transportation services were permissible under an exemption to the franchise for tour operators "providing a motor vehicle utilized by a tour or travel agent for the transportation of passengers as part of the tour." *Id.* at 56. Under the tour operator exemption, Lettsome could "continue to pick up such passengers at the airport, upon showing the appropriate documentation." *Id.*

The preliminarily injunction entered on March 10, 1997, prohibited VIPA "from permitting and facilitating others that [sic] the Virgin Islands Taxi Association, Inc., and those identified in Section 1, subsection (e) of Act No. 5231 from operating public taxicab service from the Cyril E. King Airport, St. Thomas . . . ." *Id.* at 58. The preliminary injunction also barred East End, Caneel, the Ritz "and all others similarly situated, and their officers, agents, servants, employees, attorneys, assignees, successors in interest and all persons acting in concert or participating with them . . . from operating taxicab service from the Cyril E. King Airport in St. Thomas, except as provided in Act No. 5231, [s]ection 1, subsection (e) . . . ." *Id.* East End, VIPA, Caneel, and the Ritz appealed the March 1997 order and injunction.

VITA moved the Territorial Court to modify the terms of the preliminary injunction to remove all references to Act 5231, section 1(e). On May 25, 1997, the trial court granted VITA's motion and issued an amended preliminary injunction order. The May 25, 1997, order omitted the references to the statutory exceptions, and replaced them with the actual text of Act 5231, section 1(e).[4] No other changes were made to the March 10, 1997, preliminary injunction.

On September 23, 1997, this Court upheld the constitutionality of Act 5231 and held that the issuance of the preliminary injunction was not an abuse of discretion. *VI Port Auth. v. VI Taxi Ass'n, Inc.*, 979 F. Supp. 344 (D.V.I. 1997). The Court explained that the statutory exemptions to the franchise should be construed in light of VIPA's rules for taxi operations at the airport. Specifically, the Court held that compliance with VIPA's voucher rules is a prerequisite to claiming the tour operator exemption. In

---

[4] Notwithstanding the issuance of the May 25, 1997, amendment, the trial court has referred to the March 10, 1997, preliminary injunction. To promote consistency, we refer to the original preliminary injunction together with the amendment as the "March 10, 1997, preliminary injunction," or the "preliminary injunction."

affirming the ruling that VITA would likely succeed in showing a violation of the franchise, the Court emphasized that

> none of the appellants have complied with the voucher or receipt requirement [of the 1987 Rules] to show that their guests' ground transportation had been prepaid and prearranged. Indeed, the trial court specifically found that, while a particular hotel may have arranged for one of its contracted taxi drivers to pick up arriving guests, many times the guests had not prepaid or prearranged for such service but paid the taxi driver directly at the airport.

*Id.* at 352. Additionally, the Court stated:

> The appellants are on notice of exactly what they must do to comply with Act No. 5231, and, if they so desire, how they may bring their conduct within the tour operator exemption of section 1(s). The actions of appellants' selected taxicab drivers picking up passengers without vouchers or receipts, openly soliciting passengers coming off the planes, and conducting cash transactions between guests and drivers were what the Territorial Court found violated the exclusive franchise. The discontinuance of those types of violative activities complies with the preliminary injunction.

*Id.* at 353.

On October 1, 1999, VIPA issued new rules for taxi and tour operators (the "1999 Rules"). *See* Taxi and Tour Operators Regulations at Virgin Islands Port Authority Facilities (Oct. 1, 1999). The 1999 Rules define a valid voucher as

> any document or combination of documents, clearly evidencing a prepaid or prearranged relationship between a passenger (or group of passengers) and a tour operator creating a right or entitlement of ground transportation to or from the airport . . . as part of a prepaid or packaged tour which includes either land lodging or transportation on an ocean common carrier, provided that the ground transportation to and from the airport . . . is part of the overall transportation arranged for in the prepaid or packaged tour.

*Id.* at Rule 14.

On May 10, 2004, CBI purchased the assets of the Caneel Bay Resort from Caneel Bay, Inc., the former owner of the resort.[5] CBI also acquired the right to operate under the trade name, "Caneel Bay Resort." The attorney who had represented Caneel in this matter since 1997, continued to do so after CBI bought the resort.

On May 12, 2004, VITA moved the Superior Court (formerly, the Territorial Court) to compel VIPA to show cause why it should not be held in contempt for violating the terms of the preliminary injunction. A hearing on the matter was conducted on June 24, 2005. Though neither East End, Caneel, nor the Ritz were ordered to show cause, their attorneys were present and fully participated at the hearing. VITA introduced examples of two types of vouchers as exhibits 2 and 3, which it described as "prepaid" and "prearranged." At the end of the hearing, the Superior Court concluded that the "prearranged" vouchers failed to comply with the 1999 Rules, and that VIPA violated the franchise by allowing non-VITA members to use "prearranged" vouchers to pick up passengers from the airport.

On August 3, 2005, the Superior Court entered an order holding VIPA in contempt for its "flagrant and willful violation" of the 1997 preliminary injunction. Though VIPA was held in contempt, the August 3, 2005, order did not impose sanctions against VIPA. The order stated:

> Virgin Islands Port Authority shall not permit or facilitate any taxi operator who is not a driver for Plaintiff, Virgin Islands Taxi Association to pick up any passengers for hire from Cyril E. King Airport unless said taxi operator and passenger can present a valid **prepaid** voucher or receipt to Plaintiff or Defendant which demonstrates a contract between the passenger and a hotel operator or a marine vessel, and taxi operator and which **prepaid** voucher or receipt contains the words "Right" or "Entitlement" thereon . . . .

(Order 2, August 3, 2005.) (emphasis in original). The order also directed VIPA, as well as East End, Caneel, and the Ritz to "cease and desist from operating in a manner contrary to the statutory requirements of Act 5231 of the Virgin Islands Code, the [o]pinions and [j]udgments of [the Superior

---

[5] Caneel Bay, Inc. was the entity that filed a notice of appearance and answer in response to VITA's complaint against Caneel Bay Resort in 1997.

Court], and the [of] the Appellate Division of the District Court heretofore entered . . . ." (*Id.*) Finally, the August 3, 2005, order stated "the injunction herein shall remain in full force and effect." (*Id.*)

On February 6, 2006, VITA moved the Superior Court for a temporary restraining order and to compel East End, VIPA, Caneel, and the Ritz to show cause why they should not be held in contempt for violating the March 10, 1997, preliminary injunction and the August 3, 2005, order. In an order dated February 14, 2006, the court denied VITA's request for a temporary restraining order. On March 1, 2006, the Superior Court conducted a show cause hearing. After hearing all the evidence, the court reserved its ruling on the matter.

In a memorandum opinion and order entered on June 13, 2006, the court adjudged East End, VIPA, Caneel, and the Ritz to be in contempt for continuing to use "prearranged" vouchers rather than "prepaid" vouchers, in violation of the 1997 preliminary injunction and August 3, 2005, order.

The court explained the difference between "prepaid" and "prearranged" vouchers:

> The pre-paid voucher is presented by the passenger upon arrival and indicates that their transportation to the hotel has been pre-paid. In appearance, the pre-paid voucher resembles an airline ticket. On the other hand, the "prearranged" vouchers . . . are generally sent to Defendant hotels' guests by email or facsimile copy and are also delivered to them by tour operators employed by the hotels and to V.I.P.A.'s monitor at the airport. There is no indication on the prearranged voucher that the passenger had pre-paid for transportation.

(Mem. Op. 6, June 13, 2006.) In the Superior Court's view, the "pre-arranged" type vouchers used before the June 24, 2005, show cause hearing

> do not even come close to complying with [the] definition [of "valid voucher" contained in the 1999 Rules], and do not even contain the words "right" or "entitlement" or otherwise evidence a contractual relationship between Defendant hotels and [East End] and their guests/passengers, as mandated by the Appellate Division. All Defendants either knew or should have known that these vouchers were in clear violation of the Rules and Regulations and unacceptable to transport persons from the airport, but despite this knowledge, utilized those vouchers anyway.

669

(*Id.* at 18.) The court also found that, although the vouchers used by East End, VIPA, Caneel, and the Ritz after the June 24, 2005, hearing "contain the 'magic' words required by the Appellate Division . . . ." (*Id.* at 19.) However, the court concluded that "there is no proof on these vouchers that Defendants' guests arriving at the airport have actually pre-paid for their transportation." (*Id.* at 19.)

The Superior Court imposed monetary sanctions on East End, VIPA, Caneel, and the Ritz. The June 13, 2006, order stated:

> Defendants Virgin Islands Port Authority, East End Taxi Association, Inc., the Ritz Carlton Virgin Islands, Inc., and Caneel Bay Resort, shall be assessed severally the sum of $1,000 per day effective March 1, 2006, until such time as they comply with the Court's Preliminary Injunction, and Order dated August 3, 2005, . . . .

(Order 1, June 13, 2006.)[6] Like the August 3, 2005, order, the June 13, 2006, order provided that "the Preliminary Injunction herein shall remain in full force and effect" with respect to East End, VIPA, Caneel, and the Ritz. (*Id.*)

Thereafter, the Ritz moved the Superior Court to reconsider its ruling in the June 13, 2006, order. During the pendency of the Ritz' motion for reconsideration, East End, VIPA, and Caneel timely filed notices of appeal from the June 13, 2006, order.

VITA again moved for an order to show cause, based on allegations of contemptuous conduct that occurred after the issuance of the June 13, 2006, order. On July 31, 2006, the Superior Court entered an order stating that "a show cause hearing shall be heard on Thursday, September 7, 2006, . . . ." (Order 1, July 31, 2006.) The court also directed "that copies of this Order shall be personally served on . . . Mr. Brad Jencks, General Manager of Ritz-Carlton Virgin Islands, Inc.," and on counsel for East End, VIPA, Caneel, and the Ritz. (*Id.*)

At the September 7, 2006, hearing, the trial judge asked whether Jencks was present. Counsel for the Ritz responded that Jencks was not in court, but that the Ritz had designated a different corporate representative who was present. The court issued a bench warrant for

---

[6] The June 13, 2006, order also stated that VIPA "shall pay Eight Thousand One Hundred Thirty-Five Dollars ($8,135.00) as retroactive sanctions with respect to the Court's August 3, 2005, order . . . ." (*Id.* at 2.) However, VIPA has not challenged that sanction on appeal.

Jencks' arrest, which stated that Jencks had been adjudged in contempt for failing to appear at the September 7, 2006, hearing. During the hearing, the trial court denied a motion to vacate the warrant for Jencks' arrest. The court also denied the Ritz's motion for reconsideration of the June 13, 2006, order.

At the conclusion of the September 7, 2006, hearing, the Superior Court reserved its ruling as to any new findings of contempt. Additionally, the trial judge stated:

> The [c]ourt will give the Defendants until [the] close of business on Monday, September 11th to pay the fines as ordered on June the 13th into the registry of the Court, failing which an order for [certain managers and officers of East End, VIPA, Caneel, and the Ritz, including Jencks] to show cause why they should not be held in contempt will issue.

(Show Cause Hr'g Tr. 306, September 7, 2006.) Specifically, the judge ordered East End, VIPA, Caneel, and the Ritz, each to pay to the Superior Court a sum of $105,000[7] no later than September 11, 2006.

The Ritz timely appealed from the September 7, 2006, oral orders denying its motion for reconsideration, and directing payment of the June 13, 2006, sanction; and from the June 13, 2006, contempt ruling. Jencks timely appealed from the September 7, 2006, order adjudging him in contempt and issuing a bench warrant for his arrest. On September 11, 2006, this Court granted a motion filed by the Ritz to stay the execution of the Superior Court's September 7, 2006, verbal order.

The following issues are raised on appeal: (1) whether VITA properly renewed its franchise under Act 5231; (2) whether the contempt sanctions imposed by the June 13, 2006, order, and the September 7, 2006, verbal order were civil or criminal in nature; and (3) whether the evidence adduced at the show cause hearings was sufficient to support the findings of contempt and sanctions imposed against the appellants.

---

[7] The sum of $105,000 represents the portion of the $1,000 *per diem* contempt sanction imposed by the June 13, 2006, order, that accrued from March 1, 2006, until June 13, 2006.

## II. JURISDICTION

As a threshold matter, this Court must determine whether it has jurisdiction to review the contempt orders during the pendency of the underlying action in the Superior Court.

> A distinction is made, for appealability purposes, between criminal contempt proceedings which have for their purpose the vindication of the dignity and authority of the court, and civil contempt proceedings which are intended to enforce the rights of private parties, to compel obedience to orders and decrees made to enforce their rights and to give them a remedy to which the court deems them entitled.

*United States Steel Corp. v. Fraternal Ass'n of Steel Haulers*, 601 F.2d 1269 (3d Cir. 1979) (citing *Doyle v. London Guarantee Co.*, 204 U.S. 599, 604-05, 27 S. Ct. 313, 51 L. Ed. 641 (1907)).

 Criminal contempt sanctions are considered final and appealable in pending actions by parties and non-parties. *See Commonwealth of Pennsylvania v. Local Union 542, Intern. Union of Operating Engineers*, 552 F.2d 498, 501 (3d Cir. 1977), *cert. denied*, 434 U.S. 822, 98 S. Ct. 67, 54 L. Ed. 2d 79 (1975) (holding that a non-party may appeal an order of criminal contempt arising out of a pending action under 28 U.S.C. § 1291); *Carbon Fuel Co. v. United Mine Workers of America*, 517 F.2d 1348, 1349 (4th Cir. 1975) (reasoning that a party may immediately appeal a criminal contempt sanction in a pending action because "criminal contempt proceedings are independent of the main action and any conviction therein is a final order and appealable"); *International Business Machines Corp. v. United States*, 493 F.2d 112, 114 (2d Cir. 1973) ("An order finding a party in criminal contempt is appealable.").

 On the other hand, "[f]or civil contempt orders the settled rule is that, when directed against parties, such orders are interlocutory and unreviewable except incident to an appeal from a judgment otherwise appealable." *Halderman v. Pennhurst State School & Hospital*, 673 F.2d 628, 636 (3d Cir. 1982); *see also Gregory v. Depte*, 896 F.2d 31 (3d Cir. 1991) ("[T]he usual rule is that an interlocutory civil contempt is not appealable . . . ."); *Carbon Fuel Co.*, 517 F.2d at 1349 ("[A] civil contempt proceeding is in effect a continuation of the main action and therefore a party to a suit may not review upon appeal an order [for civil contempt] . . . except in connection with appeal from a final judgment in

the main action." (citations and quotations omitted)). A non-party, however, may appeal a civil contempt sanction during the pendency of the underlying litigation. *United States v. Accetturo*, 842 F.2d 1408, 1412 (3d Cir. 1988); *see also In re Flat Glass Antitrust Litigation*, 288 F.3d 83 (3d Cir. 2002) ("The contempt order effectively transforms the 'interlocutory' into the 'final' by giving the [nonparty] witness a distinct and severable interest in the underlying action." (citations and quotations omitted)).

## A. Appealability of the June 13, 2006, Order

The memorandum accompanying the June 13, 2006, contempt order labeled the sanctions imposed therein as civil contempt sanctions. As such, the sanctions would not ordinarily be appealable during the pendency of the case in the Superior Court. East End, VIPA, Caneel, and the Ritz argue that the sanctions were criminal and thus subject to immediate appellate review.

■ For the purposes of determining the Court's jurisdiction to review the June 13, 2006, contempt order, the Court assumes the correctness of the contempt finding therein. *See Gregory v. Depte*, 896 F.2d 31, 34 (3d Cir. 1991). However, the Court does not assume that the trial court has correctly characterized a sanction as either civil or criminal. *See Latrobe Steel Co. v. United Steelworkers of America, AFL-CIO*, 545 F.2d 1336, 1344 (3d Cir. 1976). Rather, the Court must "ascertain independently the nature of the decree instead of treating the [trial] court's mere characterization or label as dispositive." *Id.*; *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828, 114 S. Ct. 2552, 129 L. Ed. 2d 642 (1994) ("[T]he stated purposes of a contempt sanction cannot be determinative.").

■ "[W]hether a contempt is civil or criminal turns on the 'character and purpose' of the sanction involved." *Bagwell*, 512 U.S. at 827; *see also McDonald's Corp. v. Victory Investments*, 727 F.2d 82, 86 (3d Cir. 1984) ("The dichotomy between criminal and civil contempt lies in the function of the order."). A contempt sanction is civil if it is remedial, and designed to benefit aggrieved parties. *Bagwell*, 512 U.S. at 827.[8] In contrast, a

---

[8] Proceedings for civil contempt are usually instituted upon motion of a party to a pre-existing action, and are conducted as part of the underlying action. *See Roe v. Operation Rescue*, 919 F.2d 857, 868 (3d Cir. 1990) (noting that proceedings for civil contempt are instituted and tried as part of the underlying action).

contempt sanction is criminal if it is punitive, and serves to vindicate the authority of the court. *Id.*[9]

 A fine is considered a civil, remedial contempt sanction if it either "'coerc[es] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.'" *Id.* at 829 (quoting *United States v. Mine Workers*, 330 U.S. 258, 303-304, 67 S. Ct. 677, 701, 91 L. Ed. 884 (1947)). A fine is coercive "only if the contemnor is afforded an opportunity to purge." *Bagwell*, 512 U.S. at 829. Coercive fines

> look to the future and are designed to aid the plaintiff by bringing a defiant party into compliance with the court order or by assuring that a potentially contumacious party adheres to an injunction by setting forth in advance the penalties the court will impose if the party deviates from the path of obedience.

*Latrobe*, 545 F.2d at 1344; *see also Roe v. Operation Rescue*, 919 F.2d 857, 868 (3d Cir. 1990) ("*Roe I*") ("By coercing future compliance, such a fine benefits the complainants and thus is civil in nature."). Since payment is contingent on future disobedience, coercive fines may not be imposed retroactively. *See Gregory*, 896 F.2d at 34. *Per diem* fines imposed for each day of continued non-compliance are civil sanctions that "exert a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged." *Bagwell*, 512 U.S. at 829; *see also Latrobe*, 545 F.2d at 1343. "Fixed fines also may be considered purgable and civil when imposed and suspended pending future compliance." *Bagwell*, 512 U.S. at 829 (citing *United States v. Mine Workers*, 330 U.S. 258, 303-304, 67 S. Ct. 677, 701, 91 L. Ed. 884 (1947)).

 Compensatory fines "are essentially backward looking, seeking to compensate the complainant through the payment of money for damages caused by past acts of disobedience." *Latrobe Steel Co.*, 545 F.2d at 1344. As such, compensatory fines may be imposed retroactively. *See John T. ex rel. Paul T. v. Delaware County Intermediate Unit*, 318 F.3d 545, 554 (3d Cir. 2003) (explaining that a retroactive fine

---

[9] Criminal contempt proceedings "are separate from the actions which spawned them." *Latrobe Steel Co.*, 545 F.2d 1343. "If a criminal contempt action develops from a civil proceeding, it bears a separate caption apart from the civil suit." *Id.*

may be compensatory if it "involves ordering payment for the costs of past noncompliance"). In order for a fine to be compensatory, it must be based on evidence of a plaintiff's actual loss or a defendant's actual profit resulting from the disobedience. *McDowell v. Philadelphia Housing Authority (PHA)*, 423 F.3d 233, 241 (3d Cir. 2005) ("[S]uch an award, by very definition, must be an attempt to compensate plaintiff for the amount he is out-of-pocket or for what defendant by his wrong may be said to have diverted from the plaintiff or gained at plaintiff's expense."). The amount of a compensatory fine may not exceed the actual damages caused by the contemptuous conduct. *Gregory*, 896 F.2d at 34; *Quinter v. Volkswagen of America*, 676 F.2d 969, 975 (3d Cir. 1982); *Carty v. Schneider*, 986 F. Supp. 933, 38 V.I. 213 (D.V.I. 1997).

 ■ In contrast, a fine is a criminal contempt sanction if the amount of the fine is fixed and imposed unconditionally as a punishment for past disobedience. *See Hicks*, 485 U.S. at 632-33 ("An unconditional penalty is criminal in nature because it is solely and exclusively punitive in character." (citations and quotations omitted)); *see also Latrobe Steel Co.*, 545 F.2d at 1343 ("[T]he penalties arising out of adjudications of criminal contempt are generally an absolute fine of a specific amount . . . ."). Criminal fines are retroactive, and may not be avoided by purging the contemptuous conduct. *See Penfield Co. of Cal. v. SEC*, 330 U.S. 585, 590, 67 S. Ct. 918, 921, 91 L. Ed. 1117 (1947) (holding that a "flat, unconditional fine" for $50 was a criminal sanction because the contemnor had no subsequent opportunity to reduce or avoid the fine through compliance).

 Here, the June 13, 2006, order was phrased in terms of a *per diem* fine of $1,000 for each day that East End, VIPA, Caneel, and the Ritz, failed to comply with the March 10, 1997, preliminary injunction and the August 3, 2005, order. However, the sanction was retroactive to March 1, 2006. By the time the contempt order was issued on June 13, 2006, the sanction imposed on each of the defendants amounted to a fixed, retroactive fine of $105,000, (the "retroactive fine," or the "$105,000 fine") plus a prospective fine of $1,000 for each day of non-compliance after June 13, 2006 (the "$1,000 *per diem* fine").

 By its own terms, the retroactive fine sanctioned past conduct. East End, VIPA, Caneel, and the Ritz could not reduce or avoid the $105,000

fine by purging their contempt.[10] Therefore, the $105,000 retroactive fine is not coercive. *See, e.g., McDonald's Corp.*, 727 F.2d at 87 ("It is evident that the fine was predicated on past acts of contempt rather than on continued failure to obey because it was payable even though [the contemnor] complied with the court's order on the day the order was issued."). Thus, in order for the retroactive fine to be properly classified as a civil sanction, it must aim to compensate VITA for damages incurred as a result of the contemptuous conduct. *See Gregory*, 896 F.2d at 34.

The record below contains scant evidence of the loss to VITA or the profit to East End, VIPA, Caneel, and the Ritz caused by the contemptuous conduct during the relevant period from March 1, 2006, through June 13, 2006. In its June 13, 2006, opinion, the court addressed the issue of VITA's damages:

> With respect to the contempt herein, Plaintiff sought an award of $750,000 in damages due to lost business. While this amount appears conservative given the period of the violation involved, *i.e.,* March 10, 1997, to June 24, 2005, it would be improper to award such damages as a sanction for the Defendants' conduct while the trial of the matter is still pending. However, given the nature of the violation herein and its longstanding existence, a daily assessment of $1,000.00 per Defendant per day until such time as they fully comply with the injunction herein is in order.

(*Id.*). However, neither the opinion nor the order entered on June 13, 2006, set forth any basis for the $1,000 figure.[11]

VITA points to Richardson's testimony at the March 1, 2006, show cause hearing that, on June 25, 2005, the Ritz used only VITA drivers to transport its guests from the airport. He stated that VITA collected "about $2,500 plus" in fares from the Ritz's guests on June 25, 2005. However,

---

[10] While the parties' actions could not affect the $105,000 fine, the amount of such fine was dependent on the timing of the entry of the written contempt order after the March 1, 2006, show cause hearing. Had the trial court issued its ruling earlier or later than June 13, 2006, the amount of the retroactive fine would have decreased or increased accordingly. That aspect of the $105,000 sanction is not coercive, compensatory, or punitive. Rather, it is arbitrary.

[11] If accurate, VITA's own $750,000 damage claim would suggest that VITA suffered losses of approximately $300 per day during the relevant period, far less than the $1,000 daily sanction.

there was no evidence regarding what percentage of those guests, if any, would have otherwise been transported by non-VITA drivers using invalid "pre-arranged" vouchers.[12] VITA also points to a manifest from Caneel Bay Resort, dated February 27, 2006, and entered as an exhibit during the March 1, 2006, hearing. Richard Blyth ("Blyth"), Managing Director of Caneel Bay Resorts, testified at the March 1, 2006, hearing that the manifest showed that twelve guests were transported from the airport using "pre-arranged" vouchers at a transfer fee of $85.[13] Although the manifest was not included as part of the record on appeal, VITA contends that Caneel made $1,105 in taxi fares on February 27, 2006, and claims that this is a valid evidentiary basis for imposing a compensatory fine.

Both figures cited by VITA suffer from the same fundamental flaw. VITA has failed to provide any evidence or assertions regarding what portion of the $1,105 or $2,500 figures represented the actual profit received by the Ritz or Caneel. Without even a rough breakdown of new and gross revenues for taxi fares, there is an insufficient evidentiary basis for the imposition of compensatory fines. *See, e.g., AccuSoft Corp. v. Palo*, 237 F.3d 31 (1st Cir. 2001) (affirming the denial of compensatory sanctions because the plaintiff failed to identify evidence in the record beyond mere circumstantial evidence to directly connect defendant's contemptuous actions with specific lost customers).

■■■ Furthermore, the June 13, 2006, order did not make the fines payable to VITA.[14] At the conclusion of the September 7, 2006, show cause hearing, the trial judge directed that the $105,000 retroactive fine be paid to the registry of the Superior Court. The retroactive fines levied by the June 13, 2006, order do not serve to compensate VITA, but rather to vindicate the authority of the Superior Court.[15] *See Hicks*, 485 U.S. at 632

---

[12] Additionally, Allison Peters ("Peters"), the Ritz's Executive Assistant Manager for the Rooms Division, stated that Richardson's $2,500, figure was "very high" compared to the revenues typically collected from "pre-arranged" transportation during that time period. (Show Cause Hr'g at 234, March 1, 2006.)

[13] In its appellate brief, VITA claims that thirteen guests were transported pursuant to invalid "pre-arranged" vouchers.

[14] The June 13, 2006, order made no provisions for the disposition of the funds paid as sanctions.

[15] Although the June 13, 2006, opinion labeled the fines as coercive civil sanctions, the trial judge stated several times during the March 1, 2006, and September 7, 2006, hearings that the sanctions were intended to vindicate the authority of the court with respect to the June

("If the relief provided is a fine, it is . . . punitive when it is paid to the court, though a fine that would be payable to the court is also remedial when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order."); *see also Roe I*, 919 F.2d at 870 ("[I]f the fine is unconditionally payable to the court, the relief is punitive, not remedial, and the contempt proceeding is, by definition, criminal.").

■ Since the retroactive fine of $105,000 was fixed, unconditional, lacked a sufficient evidentiary basis, and was not made payable to VITA, the Court finds that it was a criminal contempt sanction. *See, e.g., United States v. Pozsgai*, 999 F.2d 719, 735 (3d Cir. 1993) (holding that a contempt order labeled by the district court as "civil" was actually a criminal contempt because the order was retroactive, seeking to penalize previous violations, and was punitive, serving no compensatory purpose); *McDonald's Corp.*, 727 F.2d at 87 (noting that a contempt fine was "more akin to a criminal fine than a coercive civil fine" because it was payable to a charitable organization rather than the plaintiff, contained no purge provision, and was not based on evidence of actual damages incurred by the plaintiff).

■ In contrast, the $1,000 *per diem* fine that began to accrue on June 14, 2006, was forward-looking, and payment of such fines was conditioned upon future non-compliance with the March 10, 1997, preliminary injunction and the August 3, 2005, order. As such, the $1,000 *per diem* fine is designed to coerce future compliance with the March 10, 1997, preliminary injunction and the August 3, 2005, order. *See Roe*, 919 F.2d at 868; *Latrobe Steel Co.*, 545 F.2d at 1344. "When a contempt order contains both a punitive and a coercive dimension, [f]or purposes of appellate review it will be characterized as a criminal contempt order." *Lamar Financial Corp. v. Adams*, 918 F.2d 564, 567 (5th Cir. 1990); *see also Union Tool Co. v. Wilson*, 259 U.S. 107, 110, 42 S. Ct. 427, 66 L. Ed. 848 (1922) ("Where a fine is imposed, partly as compensation to the

---

13, 2006, order. For example, at the conclusion of the March 1, 2006, hearing, the judge stated:

THE COURT: [T]his Court has every intention of vindicating its authority with respect to compliance of its Order.

(Show Cause Hr'g Tr. 303, March 1, 2006.)

complainant and partly as punishment, the criminal feature of the order is dominant and fixes its character for purposes of review.").

Accordingly, the Court has jurisdiction to review the June 13, 2006, order as a "final judgment of criminal contempt." *See* Revised Organic Act of 1954 23A, 48 U.S.C. § 1613a; Act No. 6730 § 54(d)(1) (Omnibus Justice Act of 2005); *see also In re Horton*, 2003 U.S. Dist. LEXIS 3054, *8 (D.V.I. Feb. 5, 2003).

## B. Appealability of the September 7, 2006, Order

■■■ Since Jencks was not a party to the litigation below, this Court has jurisdiction to review his appeal from the oral September 7, 2006, contempt order, whether the sanctions imposed therein were civil or criminal. *In re Flat Glass Antitrust Litigation*, 288 F.3d 83 (3d Cir. 2002).

## III. STANDARD OF REVIEW

"The imposition of contempt is reviewed under an abuse of discretion standard and will only be disturbed if there is an error of law or a clearly erroneous finding of fact. [The Court] determine[s] on a plenary basis whether the district court committed an error of law." *John T. ex rel. Paul T. v. Delaware County Intermediate Unit*, 318 F.3d 545, 551 (3d Cir. 2003) (quoting *Harris v. City of Philadelphia*, 47 F.3d 1342, 1349 (3d Cir. 1995)).

## IV. ANALYSIS

### A. Expiration of Act 5231

The appellants argue that VITA failed to renew its exclusive franchise for public taxicab service from the Cyril E. King Airport before the expiration of the initial ten-year period of the franchise. As a result, the appellants contend that they could not be held in contempt for violating the March 10, 1997, preliminary injunction and the August 3, 2005, order, since Act 5231, upon which the preliminary injunction and order were based, had expired prior to the dates on which their allegedly contemptuous actions occurred.

Pursuant to Act 5231,

> This franchise shall commence upon the first day of the month following the acceptance of the franchise and shall continue for a period

of ten years or until terminated by the Authority as provided in this Act; provided, however, [that] the franchisee shall have the option to renew the franchise for an additional ten year period subject to the provisions of this act.

Act. No. 5231(f).

VITA accepted the franchise on April 10, 1987. Under Act 5231(f), the franchise commenced on May 1, 1987. *See* Act 5231(f). Therefore, absent a proper renewal, the franchise granted in Act 5231 would have expired on April 30, 1997. *See id.*

VITA claims that it renewed its franchise by letter from VITA's attorney to the Executive Director of VIPA, dated February 13, 1995. The February 13, 1995, letter stated:

> Please accept this as official notice by the Virgin Islands Taxi Association, of its intent and desire to renew the duration term of the Taxi Franchise at the Cyril E. King Airport. Please contact [VITA's attorney] or the President of the Association to negotiate franchise fees for the renewal term, and to accomplish all necessary paper work to effectuate and evidence the extension of the franchise. . . .

(Hodge Letter, Feb. 13, 1995.) VITA also points to a letter from VIPA's Acting Property Manager to the President of VITA, dated June 8, 1995, as support for the renewal of the franchise. The June 8, 1995, letter provides that the annual fee for operating the franchise would be increased to $30,326.04, calculated in accordance with the taxi concession agreement. The June 8, 1995, letter also states: "It should also be noted that we both agreed that April, 1995, marked the start of the eighth year of your ten year term to operate the taxi franchise at Cyril E. King Airport." (Mills Letter, June 8, 1995.)

 Whether VITA renewed the franchise granted in Act 5231 depends on whether a valid contract for the renewal of such franchise existed. "Although offer, acceptance, and consideration are required elements of contract formation, the decisive inquiry in contract formation is the manifestation of assent of the parties to the terms of the promise and to the consideration for it." *Morton v. Hewitt*, 202 F. Supp. 2d 394, 396 (D.V.I. 2002) (quoting *ATACS Corp. v. Trans World Communications, Inc.*, 155 F.3d 659, 665 (3d Cir. 1998) (internal quotations omitted). "It is well-settled law that 'the test for enforceability of an agreement is

whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced.'" *Id.*

The evidence the record does not support the conclusion that there was no mutual assent to the renewal of the parties' franchise agreement. To the extent that VITA expresses in the February 13, 1995, letter "an intention and desire to renew" the franchise agreement, that letter evinces merely an agreement to agree. Courts routinely hold that agreements to agree are not enforceable contracts. *See, e.g., Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 323 (5th Cir. 2006) ("[W]here an agreement leaves essential terms open for future negotiations, it is not a binding contract but, rather, an unenforceable agreement to agree.") (quotations omitted) (applying Texas law); *Giverny Gardens, L.P. v. Columbia Hous. Ptnrs. L.P.*, 147 Fed. Appx. 443, 449 (6th Cir. 2005) ("[A]greements to bind parties to future negotiations in good faith are unenforceable agreements to agree.") (applying Kentucky law).

Even if the letters showed a manifestation of mutual assent to a renewal of the franchise agreement, there is further evidence that the parties did not enter into a binding contract. To the extent that the February 13, 1995, letter purports to manifest VITA's intent to renew its franchise with VIPA, the letter is insufficiently definite to form a contract because it does not contain a single term of the franchise agreement. *Cf. Echols v. Pelullo*, 377 F.3d 272, 278 (3d Cir. 2004) ("The purses were not material and essential terms, and the fact that they were left open to future negotiation does not render the contract unenforceable."); *Giuliano v. Nations Title*, No. 96-2331, 1998 U.S. App. LEXIS 1136, at *12-13 (1st Cir. Jan. 23, 1998) ("[A] letter of intent may be binding or nonbinding, depending on the intentions of the parties. . . . The essential terms must be set forth with sufficient definiteness and clarity that a court, by interpretation with the aid of existing and contemplated circumstances, may enforce it.") (internal quotations and citations omitted); *Providers of Northeast Pennsylvania, Inc. v. Maxicare Health Plans, Inc.*, 677 F. Supp. 302, 304 (M.D. Pa. 1987) (finding that a party's letter of intent "contained definite, enforceable terms" and thus was binding).

To the extent that VITA argues that VIPA's June 8, 1995, letter contains the terms VITA's letter lacks, that argument is deficient. The terms conveyed in the June 8, 1995, letter pertain to the then-existing franchise

agreement between VIPA and VITA; they do not purport to apply to a renewed franchise agreement between the parties.

 However, VITA argues that the franchise properly continued on a month-to-month basis, even if no valid contract existed for the renewal of the franchise. It is true that, under Act 5231,

> [i]n the event the franchisee remains in possession of the premises after the expiration of this franchise as specified in subsection (f) of this section, it shall be deemed to be occupying the premises as a tenant month to month, subject to all the applicable conditions, provisions, and obligations of this franchise.

Act No. 5231(m). However, a plain reading of the Act makes clear that the month to month tenancy would apply to VITA's occupation of the physical premises allocated to the franchise at the Cyril E. King Airport, not to the exclusive right to provide public ground transportation from the airport. Indeed, if the franchise had expired pursuant to Act 5231(f), then VITA would no longer have the exclusive right to transport passengers from the airport, even if it continued to occupy the space reserved for it at the airport and consequently was obligated to pay VIPA for such use pursuant to Act 5231(m).

Accordingly, the evidence in the record is insufficient to support the existence of a valid renewal of the franchise granted in Act 5231. If the franchise was not properly renewed, then the appellants could not have been held in contempt for violating the March 10, 1997, preliminary injunction and August 3, 2005, order, which incorporated the provisions of Act 5231. It is, therefore, incumbent upon the Superior Court to address the issue of franchise renewal as a threshold matter upon remand. While the Court is not convinced of the validity of VITA's franchise, the Court will address the merits of the appeal in order to assist the Superior Court's consideration of these issues on remand.

## B. $105,000 Retroactive Fine

Having determined that the $105,000 contempt fine was criminal in nature, the Court must now determine whether East End, VIPA, Caneel, and the Ritz were afforded the requisite procedural protections for an adjudication of criminal contempt.

### 1. Sufficiency of the Evidence

 A conviction for criminal contempt requires proof of guilt beyond a reasonable doubt that a party willfully disobeyed a court's order. *Waste Conversion, Inc. v. Rollins Environmental Services, Inc.*, 893 F.2d 605, 607 (3d Cir. 1990). "The element of willfulness [] is an essential component of the crime and distinguishes civil from criminal contempt." *Id.* at 609. "The mere failure to comply with a court's order, without more, is not sufficient to sustain a conviction for contempt because the crime of criminal contempt requires a specific intent to consciously disregard an order of the court." *Taberer v. Armstrong World Industries, Inc.*, 954 F.2d 888, 908 (3d Cir. 1992).

"A good faith pursuit of a plausible, but erroneous, alternative negates a finding of willfulness." *Waste Conversion*, 893 F.2d at 609; *see also United States v. Greyhound Corp.*, 508 F.2d 529, 531 (7th Cir. 1974) ("[W]illfulness, for the purpose of criminal contempt, does not exist where there is a 'good faith pursuit of a plausible though mistaken alternative.'") (quoting *In re Brown*, 147 U.S. App. D.C. 156, 454 F.2d 999, 1007 (D.C. Cir. 1971)). Accordingly, if the evidence does not support a finding that East End, VIPA, Caneel, and the Ritz willfully disobeyed the Superior Court, their contempt convictions must be overturned.

East End, VIPA, Caneel, and the Ritz all presented evidence at the March 1, 2006, show cause hearing that, since the June 24, 2005, hearing, they had been using vouchers that they believed complied with the March 10, 1997, preliminary injunction and the August 3, 2005, order. The vouchers used by East End, VIPA, Caneel, and the Ritz stated that they entitled the guests to transportation from the Cyril E. King Airport as part of a prepaid or packaged tour, as required by Act 5231 and the 1999 Rules. Moreover, representatives from Caneel and the Ritz testified that they considered the airport transportation to be prepaid, since the transportation was charged against their guests' deposits paid in advance by credit card. Darren Canton ("Canton"), Franchise Monitor for VIPA, also testified that he considered the vouchers used by Caneel and the Ritz to satisfy the requirements necessary to transport passengers under the "tour operator" exemption to Act 5231. Finally, Sherman Chinnery ("Chinnery"), Secretary of East End, testified that East End informed all of its members "that they should not violate any franchise agreement between V.I. Taxi Association or any other entity." (Show Cause Hr'g Tr. 199, March 1, 2006.)

■ Regardless of whether the vouchers used by East End, VIPA, Caneel, and the Ritz actually complied with the requirements of the March 10, 1997, preliminary injunction and the August 3, 2005, order, the evidence adduced at the March 1, 2006, hearing demonstrates a good faith effort to comply with the preliminary injunction and order. The evidence that East End, VIPA, Caneel, and the Ritz acted in good faith to comply with the court's preliminary injunction and order belies the Superior Court's June 13, 2006, order holding them in contempt for willfully disobeying a court order. Accordingly, the Superior Court abused its discretion in issuing the $105,000 criminal contempt sanction against East End, VIPA, Caneel, and the Ritz.

## C. $1,000 *Per Diem* Fine

Additionally, East End, VIPA, Caneel, and the Ritz argue that there was insufficient evidence to support a finding of civil contempt, or the imposition of the $1,000 *per diem* civil contempt fine.

■ "To prove civil contempt the court must find that (1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order." *John T. ex rel. Paul T. v. Delaware County Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003). "The plaintiff has a heavy burden to show a defendant guilty of civil contempt. It must be done by 'clear and convincing evidence,' and where there is ground to doubt the wrongfulness of the conduct, he should not be adjudged in contempt." *Robin Woods Inc. v. Woods*, 28 F.3d 396, 399 (3d Cir. 1994) (citations and quotations omitted).

■ Assuming the validity of the March 10, 1997, preliminary injunction and the August 3, 2005, order and assuming that East End, VIPA, Caneel, and the Ritz had sufficient notice of the preliminary injunction and order, the Court finds that VITA failed to show noncompliance with the preliminary injunction and order by clear and convincing evidence. The evidence adduced at the March 1, 2006, hearing showed that East End, Caneel, and the Ritz had, on occasion, transported passengers from the Cyril E. King Airport. However, VITA failed to present any evidence to demonstrate that East End, VIPA, Caneel, or the Ritz ever transported or facilitated the transportation of passengers from the airport who had not prepaid for their transportation before arriving in St. Thomas. The record does not reveal even one instance where a particular passenger was transported in violation of the March 10, 1997,

preliminary injunction or the August 3, 2005, order. Therefore, the Superior Court's imposition of civil contempt constituted an abuse of discretion.

### D. Arrest Warrant for Brad Jencks

Jencks argues that he cannot be held in contempt for failure to appear at the September 7, 2006, show cause hearing because he did not disobey any court order. Accordingly, he contends that the bench warrant for his arrest must be vacated.

■■■ To make a civil contempt finding, it must be shown that a party failed to comply with a clear and unambiguous court order. *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995); *see also United States v. Christie Indus. Inc.*, 465 F.2d 1002, 1006 (3d. Cir. 1971) ("The longstanding, salutary rule in contempt cases is that ambiguities and omissions in orders rebound to the benefit of the person charged with contempt.").

Here, the July 31, 2006, order scheduling the September 7, 2006, show cause hearing stated that the order was to be personally served upon Jencks. The order did not, however, state that Jencks was required to personally appear at the September 7, 2006, hearing. Additionally, Jencks was not subpoenaed to appear at the September 7, 2006, hearing.

■■■ The July 31, 2006, order cannot be read as an order requiring Jencks to appear at the September 7, 2006, show cause hearing, much less a "clear and unambiguous" order that he do so. Instead, the omission of any language regarding his personal appearance must be construed to Jencks' benefit. Accordingly, the Superior Court abused its discretion in finding that Jencks was in contempt for failing to appear at the September 7, 2006 hearing.

### V. CONCLUSION

Based on the foregoing reasons, the Court will reverse the Superior Court's findings of contempt against East End, VIPA, Caneel, the Ritz, and Jencks. The Court will also reverse all findings made by the Superior Court in the June 13, 2006, memorandum opinion and order and all verbal findings made during the September 7, 2006, show cause hearing as based on insufficient evidence. The Court will vacate the $105,000 retroactive contempt fine, the $1,000 *per diem* fine, and the arrest warrant for Jencks.

In addition, before proceeding further with this litigation, the Superior Court must determine whether VITA's franchise was renewed and remains in effect. An appropriate judgment follows.